# Court of Appeals, State of Michigan

# ORDER

People of MI v Kevin Raynard Jackson

Docket No. 322350

LC No. 13-020353-FH

Mark T. Boonstra
Presiding Judge

Henry William Saad

Joel P. Hoekstra
Judges

The Court orders that the motion for reconsideration is GRANTED, and this Court's opinion issued October 13, 2015 is hereby VACATED. A new opinion is attached to this order.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

DEC 0 3 2015

Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEVIN RAYNARD JACKSON,

Defendant-Appellant.

FOR PUBLICATION
December 3, 2015
9:00 a.m.

No. 322350
Eaton Circuit Court
LC No. 13-020353-FH

ON RECONSIDERATION

Before: BOONSTRA, P.J., and SAAD and HOEKSTRA, JJ.

BOONSTRA, P.J.

Defendant appeals by right his conviction, following a jury trial, of second-degree home invasion, MCL 750.110a(3). The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to 88 months to 22 years' imprisonment, with credit for 259 days served. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The case arises out of the invasion of, and theft of household items and money from, Traci Brown's home in Charlotte, Michigan on July 4, 2012. On that day, Brown and her three children left the home to visit her mother. According to Brown, her windows and doors were all locked when she left, and she did not leave her front door open. Brown testified that, other than herself and her children, only her mother and the father of her children knew that she and the children would be away.

Alyson Michelle Hotchkiss, who lived in the house next door to Brown, testified that she was on vacation on July 4 with her husband Randy, three of her daughters, and her grandson. She had given permission to her oldest daughter, Tashena Waycaster (who does not reside with her), and Dan Pion, to stay at her house while she was away; Hotchkiss testified that she allowed them to stay at her house while she was away because they were heroin addicts and basically homeless. Hotchkiss took her valuables with her when she left for vacation because she did not want the items stolen by Waycaster and Pion (presumably to be sold for drugs).

The backyard of LaVern and Theresa Bailey's house borders both the Brown and Hotchkiss backyards. LaVern said that he was working on his computer around 10:00 a.m. on

-1-

the morning of July 4, 2012 when he saw a man carrying something and walking from the area of Brown's house to the Hotchkiss house. LaVern was not positive that the man had come from Brown's house, "but [the man] was so close to the house" that "it kind of surprised [him]." While LaVern did not see the man come directly out of Brown's house, he did see him go into the Hotchkiss house. He described the man, who was approximately 40 yards away, as "[a] black man, medium build, short hair, about five eight, five ten." LaVern and his wife saw the same man 15 minutes later walking from the side area of Brown's house towards the Hotchkiss house, carrying a laundry basket filled with "all kinds of stuff," as well as a brown jug or jar. The man put the basket on the deck of the Hotchkiss house, noticed that he was being watched by LaVern and his wife, and walked into the house. The Baileys thought it looked a little suspicious but did not call the police at that time.

Pion and Waycaster admitted that in July of 2012 they used heroin, cocaine, crack cocaine, and marijuana; Pion would sometimes steal things to pay for the drugs and Waycaster would prostitute herself for money to pay for the drugs. Pion and Waycaster testified that defendant was staying with them at the Hotchkiss house while her parents were on vacation around the Fourth of July in 2012. According to Pion and Waycaster, they ran into defendant at the Dairy Queen in town during the daytime and returned to Hotchkiss's home to smoke marijuana and crack cocaine. They testified that after doing drugs with defendant, defendant said that he was going to leave and "hit a lick," which is a slang term meaning that defendant was going to steal something. Pion said that defendant left and returned with a storage tote containing a couple of game systems, movies, and games; he placed the items in the basement of 813 West Lawrence (the address of the Hotchkiss home) and then left and returned with what Pion thought was a 32-inch flat-screen television; according to Waycaster, defendant had socks on his hands. Pion claimed that defendant left the house again and Pion went to bed. Pion testified that Waycaster was with him at her mother's house while defendant was coming and going from the house. Waycaster testified that defendant went in and out of the Hotchkiss house at least four separate times; she saw him carry in a flat-screen television, video game systems, DVDs, and games. Waycaster denied ever entering Brown's house. Waycaster said that she told defendant that she "wanted something out of it," i.e., a cut of the profits from selling the stolen goods, and that, when asked, defendant told her that he had stolen the items and pointed to the next door neighbor's house. According to Waycaster, defendant showed her money in his pocket. Pion thought defendant was going to sell the stolen items so that they could buy drugs. Defendant was sleeping on the couch when Waycaster went to bed; when Pion and Waycaster woke up the next morning, most of the items defendant had brought into the house were gone, as was defendant. They found some small miscellaneous items taken by defendant still in the house, and hid them under a bed. Pion also discovered that $20 was missing from his car.

Matthew Andrews, a friend of defendant, testified that defendant was with him around noon on July 4, 2012 at a baseball game. According to Andrews, defendant went to Lake Michigan for the day with Andrews' family and defendant's girlfriend. They stayed in Saugatuck for a few hours and purchased fireworks on the way home, returning to Andrew's house in Charlotte around 11:00 p.m. on July 4. Andrews testified that defendant spent the night at Andrews' home. Mindy Dassance, who has a child with defendant, testified that defendant called her on July 5, 2012, asking her to pick him up at Andrews' home; she said that she did so and drove him back to her home. According to Dassance, defendant did not own a vehicle.

The Baileys called the police on July 5, 2012 after Theresa drove by Brown's house and noticed that the front door was open. Charlotte Police Sergeant James Falk arrived at Brown's house around 6:00 p.m. According to Falk, it was clear that the house had been broken into because items appeared to be missing and the rooms had been ransacked. Falk contacted Brown on the telephone at her mother's home and informed her that her house had been broken into and that property had been stolen. Falk testified that after speaking with the Baileys he knocked on the door of the Hotchkiss house. No one answered the door but through a window he could see a green laundry basket lying on the floor in the basement.

Brown drove home after receiving the telephone call from Falk. Brown noted numerous items missing from her home: a 55-inch flat-screen television, an X-box 360, a Wii, two blue-ray DVD players, over 600 DVDs, 50 Xbox games, 100 Wii games, portable DVD players, a round glass jar partially full of coins, a 32-inch flat-screen television that had been in her bedroom, a candleholder from the kitchen, food items from the refrigerator and freezer, alcohol, a brand new digital camera with a manual, a new computer printer still in the box, prescription medications, hand-held personal gaming devices, 100 Game Boy DS games, a Dell laptop computer, a window air conditioner, a GPS, and a full-size cooler. Brown testified that the dresser drawers had been emptied in her and one of her son's bedrooms, with the clothes strewn everywhere, and that a green laundry basket and $5,500 in cash had also been taken. In addition, she said that a television in another son's bedroom was tipped over and on the floor and a Wii figurine was missing. The original insurance estimate to replace the stolen items, excluding the $5,500, was $24,000.

Falk returned to the Hotchkiss home later that night after the Baileys informed him that someone was home at that house. When questioned, Waycaster indicated that in the preceding five days a woman named "Jamie" had been at the home with them. Waycaster informed Falk that the green laundry basket found in the Brown house belonged to her mother. According to Pion, he and Waycaster realized during Falk's questioning that the items defendant had brought into the Hotchkiss house had been stolen from Brown's house. Pion and Waycaster testified that they did not tell the police about defendant staying with them because they did not want to get anyone in trouble; Waycaster also testified that she was afraid of getting into trouble because she felt somewhat responsible for holding stolen items. Pion testified that he did not know who lived at the Brown house or that they would be on vacation on July 4.

Hotchkiss returned with her family to their house on July 6, 2012. When she got home, her landlord told her about the break-in at Brown's house. Hotchkiss found items later identified as stolen from Brown's house under her grandson's bed and in other areas around her house. Hotchkiss said that she called the Charlotte Police Department as soon as she found the items. Hotchkiss spoke to Waycaster on the telephone before the police arrived and told her that she and Pion needed to speak to the police or they would not be allowed to stay in her home. Pion and Waycaster again spoke with police on July 8, 2012. At first, both Pion and Waycaster minimized their knowledge of the robbery, but both identified defendant and described his conduct on July 4. Pion testified that he did not feel pressured by the police to "give up a name" and denied that he named defendant because he was a black male he knew.

Hotchkiss testified that additional items were taken from her home four days after she returned from vacation; Pion and Waycaster were not at the house when it happened. Pion and

Waycaster came over to her house and she told them what happened. Pion showed Hotchkiss a text message that he said he had received from defendant; Hotchkiss testified that the content of the text was vindictive and threatening, and that the message

> was pertaining to the fact that he had found out that [Pion] and [Waycaster] had went and talked to the police and that he couldn't believe that [Pion] basically would choose [Waycaster] over him since they were, they had grown up and been friends most of their lives. And that since he couldn't get to [Waycaster] then he would have to then basically go after me and my three little ones.

Hotchkiss never reported the text message to the police. Pion testified that he did not remember showing a text message to anyone but knew from the text that defendant was mad about something.

Brown later identified the green laundry basket, the change jar, jewelry, one of her son's digital cameras, the Wii figurine, and two fans as belonging to her. At trial, Brown also identified a missing jar, a Wii steering wheel controller, a DVD, her digital camera with the manual, and a Polaroid camera.

During the trial, Pion testified that he had been charged with the felony of receiving and concealing stolen property and that in exchange for his testimony against defendant, the prosecutor's office had agreed to allow him to plead guilty to a misdemeanor charge of receiving and concealing stolen property. Waycaster testified that she had also been charged with felony receiving and concealing stolen property, and that in exchange for her truthful testimony, the charges were reduced to misdemeanor receiving and concealing stolen property.

The jury convicted defendant of one count of second-degree home invasion, MCL 750.110a(3). Defendant was sentenced as described above. At sentencing, defendant received a score of 25 points for offense variable (OV) 13 (continuing pattern of felonious activity) and 5 points for OV 16 (value of stolen property).

This appeal followed. After defendant filed his appeal, he moved this Court to remand for resentencing pursuant to *People v Lockridge*, ___ Mich ___; ___ NW2d ___ (Docket No. 149073, decided July 29, 2015). This Court denied his motion "without prejudice to the panel's consideration of the issue in the context of the pending appeal." *People v Jackson*, unpublished order of the Court of Appeals, issued September 4, 2015 (Docket No. 322350).

## II. INSTRUCTION ON LESSER OFFENSE

Defendant argues that the trial court erred in instructing the jury on the lesser-included offense of third-degree home invasion. Defendant maintains that, by providing essentially identical instructions on second-degree and third-degree home invasion, the instructions as a whole were confusing and allowed the jury to convict defendant of the higher offense (second-degree home invasion) on no greater proof than would sustain a conviction for the lesser offense (third-degree home invasion), thus lowering the prosecution's burden of proof on the former.

The record indicates that defendant's counsel requested that the jury be so instructed, and affirmatively approved the jury instruction as read. Defendant has thus waived challenge to any error in this instruction. *People v Chapo*, 283 Mich App 360, 372-373; 770 NW2d 68 (2009).[1]

Further, even if defendant had not waived appellate review of this issue, we would find that reversal was not required. "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). The jury instructions must include all elements of the charged offenses and any material issues, defenses, and theories if there is evidence to support them. *People v Reed*, 393 Mich 342, 349-350; 224 NW2d 867, cert den 422 US 1044 (1975). This Court reviews unpreserved challenges to jury instructions for plain error affecting a party's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

"MCL 768.32(1) permits the trier of fact to find a defendant guilty of a lesser offense if the lesser offense is necessarily included in the greater offense. A lesser offense is necessarily included in the greater offense when the elements necessary for the commission of the lesser offense are subsumed within the elements necessary for the commission of the greater offense." *People v Wilder*, 485 Mich 35, 41; 780 NW2d 265 (2010). The trial court should give a "requested instruction on a necessarily included lesser offense . . . if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

In this case, defendant was charged with second-degree home invasion, and defense counsel requested, and the jury was additionally instructed on, the lesser offense of third-degree home invasion, MCL 750.110a(4). Second-degree home invasion is established when:

> A person who break and enters a dwelling *with intent to commit a felony, larceny, or assault* in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, or assault is guilty of home invasion in the second degree. [MCL 750.110a(3) (emphasis added).]

In relevant part, third-degree home invasion is established when a person:

> (a) Breaks and enters a dwelling *with intent to commit a misdemeanor* in the dwelling, enters a dwelling without permission with intent to commit a misdemeanor in the dwelling, or breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or

---

[1] We reject defendant's assertion that such an alleged instructional error cannot be waived. See *People v Carter*, 462 Mich 206, 215-16; 612 NW2d 144 (2000). Further, for the reasons noted in this opinion, the instructions did not result in manifest injustice or prejudice to defendant. *Carines*, 460 Mich at 775.

exiting the dwelling, commits a misdemeanor. [MCL 750.110a(4)(a) (emphasis added).]

Our Supreme Court has held that "[t]he second element of the lesser crime, [intended] *commission of a misdemeanor while present in the dwelling*, is subsumed within the second element of the greater crime charged [there, first-degree home invasion], [intended] *commission of a larceny while present in the dwellin*g, because every felony larceny necessarily includes within it a misdemeanor larceny." See *People v Wilder*, 485 Mich 35, 46; 780 NW2d 265 (2010). This Court had earlier concluded, in *People v Sands*, 261 Mich App 158, 163; 680 NW2d 500 (2004), that the language of MCL 750.11a(2) permits a misdemeanor larceny or misdemeanor assault to serve as the predicate offense for first-degree home invasion, rather than requiring *felony* larceny or assault. The Court reasoned that, "because felonies are specifically listed as underlying crimes for first-degree home invasion, it would be redundant to list assault and larceny separately if subsection 110a(2) was referring to only felony assaults and larcenies." *Id*. Although the *Wilder* and *Sands* Courts were considering the first-degree home invasion statute, its relevant language is the same as that of the second-degree home invasion statute. See MCL 750.110a(2), (3).[2] The rationale of those cases is therefore equally applicable to second-degree home invasion, MCL 750.110a(3), and either a misdemeanor *or* felony larceny thus may serve as the predicate offense for second-degree home invasion. Consequently, where, as here, the predicate offense for the home invasion charge was a larceny, third-degree home invasion was a lesser-included offense of second-degree home invasion.

Nonetheless, under the facts of this case, a rational view of the evidence did not support the giving of an instruction on third-degree home invasion. *Cornell*, 466 Mich at 357. In this case, there was no is no record evidence that defendant entered Brown's home to commit any crime other than a larceny. Specifically, Pion and Waycaster both testified that defendant said he was going to "hit a lick," which is a slang term meaning that defendant was going to steal something, and returned to the house later carrying items in a basket. Because felony and misdemeanor larceny may serve as the predicate offense underlying second-degree home invasion, *Sands*, 261 Mich App at 163, and because there was no evidence of any predicate act other than that (larceny) supporting the second-degree home invasion charge, the evidence in this case did not allow for a distinction between second-degree home invasion and third-degree home invasion, and therefore did not support an instruction on third-degree home invasion. The trial court thus erred in giving that instruction. *Cornell*, 466 Mich 335, 357.

The trial court and counsel for the parties appeared to struggle with how to instruct the jury that both felony and misdemeanor larceny may serve as the predicate offense underlying second degree home invasion. However, if anything, this confusion aided defendant by allowing him a chance to be convicted of a lesser offense based on a predicate offense that would have supported a higher charge. Although defendant argues that the instruction given allowed the jury to convict him of a *higher* offense than that which the evidence supported, it is the converse that

---

[2] First-degree home invasion requires proof of additional elements not at issue in this case. See MCL 750.110a(2)(a), (b).

is actually true: the instruction allowed defendant the chance to be convicted of a *lesser* offense than that which the evidence supported. Thus, the jury was allowed to consider a lesser charge that it should not have been allowed to consider. Had the jury convicted defendant of the lesser offense, he would have been subject to a lesser sentence. However, the jury convicted defendant of the higher charged offense, second-degree home invasion. We therefore hold that the improper jury instruction did not affect defendant's substantial rights. *Carines*, 460 Mich at 763-764.[3] We further hold that a defendant may not request such an instruction, only to later claim resulting confusion in the jury instructions, thus harboring error as an appellate parachute. *People v Buie*, 491 Mich 294, 299; 817 NW2d 33 (2012).

## III. PROSECUTORIAL ERROR[4]

Defendant next argues that the prosecution erred in improperly vouching for Pion and Waycaster's credibility and bolstering their testimony during closing arguments, and additionally in soliciting testimony from Hotchkiss regarding a threatening text message that was not reported to the police. We disagree. Defendant's trial counsel did not object to the prosecution's comments regarding Pion and Waycaster's testimony, to the specified closing argument comments related to them, or to Hotchkiss's statement regarding the text message. This issue is thus unpreserved and reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). "Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 329–330.

---

[3] Arguably, our analysis (based on existing caselaw) leads to a somewhat nonintuitive result: while third-degree home invasion is a necessarily-included lesser offense of second-degree home invasion involving larceny, cases where the predicate offense alleged is larceny (or assault, for that matter) will generally not require that an instruction on third-degree home invasion be given. But our analysis is consistent with the oft-repeated mantra that our task is to give fair and natural import to the language of statutes, and not to speculate as to the intent of the Legislature beyond the language expressed in the statute. See *Chico-Polo v Dep't of Corrections*, 299 Mich App 193, 198; 829 NW2d 314 (2013). Moreover, even if, in construing the home invasion statutory scheme as a whole, we were to interpret the elements of third-degree home invasion to require proof of an intended or committed misdemeanor *apart from* larceny or assault, our conclusion would not be altered. Rather, in that event, a jury instruction on third-degree home invasion still would be improper in this case, as it would be inconsistent with the charges and unsupported by the evidence. And in either event, the instruction, though erroneous, inured to defendant's potential benefit and is not grounds for reversal.

[4] As this Court recently noted in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), although the term "prosecutorial misconduct" has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' "

-7-

We review claims of prosecutorial error on a case-by-case basis by examining the record and evaluating the prosecution's remarks in context. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999). "[T]he prosecutor is permitted to argue the evidence and all reasonable inferences arising from it." *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). However, the prosecution cannot vouch for the credibility of his or her witness "to the effect that he [or she] has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). A prosecutor may, however, make reference to a plea agreement containing a promise of truthfulness, provided that the agreement is not "used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Id.* (quotation marks and citation omitted). Additionally, "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *Thomas*, 260 Mich App at 455.

In this case, defendant claims that the prosecution improperly vouched for Pion and Waycaster's credibility during her closing argument by stating that they were testifying truthfully. The prosecution stated that Pion and Waycaster testified pursuant to a plea agreement, and that the "ongoing plea agreement [was] still intact and they ha[d] to testify truthfully." The prosecution further argued that, despite their drug use, Pion and Waycaster had testified truthfully to the best of their ability and that their testimony was supported by other evidence, such as the testimony of neighbors who had seen a black male going between the Brown house and the Hotchkiss house.

Defense counsel repeatedly attacked Pion and Waycaster's credibility because of their drug use and drug addiction. In context, the prosecution's comments were made in response to defense counsel's theory of the case, that Pion and Waycaster were not credible witnesses due to drug use. *Thomas*, 260 Mich App at 454. Further, although the prosecution made reference to the plea agreement, it did not "suggest that the government had some special knowledge, not known to the jury, that [they were] testifying truthfully." *Bahoda*, 448 Mich at 276. We therefore find no error requiring reversal in the prosecution's statements concerning Pion and Waycaster's credibility.

Defendant further argues that the prosecution and the police did not have personal knowledge of the "threatening" text allegedly sent by defendant, and that the prosecution's reference to it in closing argument denied him a fair trial. Hotchkiss first referred to the text message during her cross-examination by defense counsel. On redirect, the prosecution questioned Hotchkiss regarding the timing of the text message in relation to the break-in that occurred at her home. In context, it is clear that Hotchkiss gave an unresponsive answer to the prosecution's questions after the prosecution twice instructed her not to discuss the content of the message. Unresponsive answers from witnesses are generally not prosecutorial error. See *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990) (stating that "[a]s a general rule, unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony"). Further, the prosecution did not question Hotchkiss about the content of the text message, but did make it clear through its examination that no one was charged for the break-in and that Hotchkiss did not know for sure who took the items; thus, the prosecution further inquired into the incident, not the

text, to minimize the effect of the nonresponsive reference to the content of the text message. Finally, despite defendant's assertion to the contrary, the prosecution did not refer to the text message during its closing argument and thus did not argue facts not in evidence. See *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994).

## IV. JURY COMPOSITION

Defendant argues that his Sixth Amendment right to a fair trial was violated by the jury empaneled to decide his case, because it did not represent a fair cross-section of the community. We disagree. Defendant did not raise this issue in the trial court and we review it for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

A defendant has the right to be tried by an impartial jury drawn from a fair cross section of the community. US Const, Am VI; Const 1963, art 1, § 1; *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124, cert den ___ US ___; 133 S Ct 664 (2012). In *Bryant*, our Supreme Court explained that to establish a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Id*. at 581-582, quoting *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).]

"[W]hen applying the relevant statistical tests, a court must examine the composition of jury pools and venires over time using the most reliable data available to determine whether representation is fair and reasonable." *Bryant*, 491 Mich at 599-600. "A systematic exclusion is one that is inherent in the particular jury-selection process utilized." *Id*. at 615-616 (quotation marks and citation omitted).

Defendant argues in this case that his jury was more Caucasian, more educated, and had more ties to law enforcement than a typical cross-section of the Eaton County community. In support of this assertion, defendant refers to the 2010-2011 United States Census of Eaton County, which according to defendant indicates that Eaton County is more than 90% Caucasian, about 6% African-American, and less than 4% Hispanic. Defendant asserts that his jury was "either all White, with no African-Americans present, or had only one member that was not White." However, there is no evidence in the record of the racial makeup of defendant's jury. Further, defendant provides no evidence indicating a "systematic" exclusion of African-Americans from Eaton County jury pools. See *Bryant*, 491 Mich at 595. Defendant has thus failed to establish a prima facie case for violation of the Sixth Amendment's fair-cross-section requirement with regard to race. *Id*.

With regard to education level and ties to law enforcement, defendant provides no evidence that persons possessing a certain degree of education or ties to law enforcement, or lacking the same, are members of a "distinctive" group in the Eaton County community. *Id*. Further, the record, although it does not reflect the precise education levels of the selected jurors,

indicates that the jurors came from a wide variety of professions; additionally, while four jurors acknowledged ties to law enforcement, no evidence was presented that this was disproportionate compared to the community at large. We thus conclude that defendant has failed to establish a prima facie case for violation of the Sixth Amendment's fair-cross-section requirement with regard to education level or ties to law enforcement. *Id*.

Defendant also makes passing reference to the prosecution's use of preemptory challenges to allegedly excuse one African-American juror. To the extent that defendant seeks to raise a *Batson*[5] challenge to the prosecution's use of preemptory challenges, this issue is also unpreserved and reviewed for plain error. *Carines*, 460 Mich at 763-764. Further, "unless it is clear from the record that the prosecution is using its peremptory challenges in a discriminatory fashion, a defendant who fails to raise the issue or otherwise develop an adequate record of objections forfeits appellate review of the issue." *People v Vaughn*, 200 Mich App 32, 40; 504 NW2d 2 (1993). Our review of the record does not reveal that the challenged juror was, as defendant claims, challenged because of his race. The record is devoid of any evidence regarding the racial makeup of *any* of the prospective jurors, let alone the juror in question.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was ineffective for failing to object to the jury composition and selection, failing to object to prosecutorial error, and failing to diligently inquire as to the lack of effort in attempting to obtain from the telephone or telecommunication company information regarding the text message. We disagree. Defendant did not move the trial court for a new trial or a *Ginther*[6] hearing. Our review of defendant's claim is thus limited to errors apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

It is strongly presumed that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *People v Vaughn*, 491 Mich 642, 670; 821 N2d 288 (2012) (quotation marks and citation omitted). When reviewing defense counsel's performance, the reviewing court must first objectively "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed2d 674 (1984). Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vaughn*, 491 Mich at 669 (quotation marks and citation omitted). The defendant must establish both prongs of this test to prevail on his claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). In addition, "to persuade a reviewing court that counsel was ineffective, a defendant must also overcome the presumption that the challenged action was trial strategy." *Id*.

---

[5] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

[6] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

With regard to the jury composition and alleged prosecutorial error, defendant has failed to establish a factual predicate for this claim, as discussed earlier in Parts III and IV of this opinion. *Hoag*, 460 Mich at 6. With regard to defense counsel's alleged failure to adequately investigate the text message, "[d]ecisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). In addition, "[d]efense counsel's failure to present certain evidence will only constitute ineffective assistance of counsel if it deprived defendant of a substantial defense." *People v Dunigan*, 299 Mich App 579, 589; 831 NW2d 243 (2013). A substantial defense is one that might have made a difference in the outcome of the trial. *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

The record does not indicate that anyone ever informed the police of the text message Hotchkiss testified to viewing on Pion's cellular telephone; Hotchkiss testified that she did not inform the police of the text after her house was robbed, and Pion testified that he did not show the text to anyone. Moreover, her original statement regarding the text was elicited from a question by trial counsel. Trial counsel was not ineffective for failing to request purported evidence of which not even the police, let alone the prosecution, was aware. Thus, defendant cannot establish that trial counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 US at 690. Further, even if trial counsel's performance was deficient on this issue, in light of other testimony incriminating defendant, defendant cannot demonstrate that he was deprived of a substantial defense. *Dunigan*, 299 Mich App at 589.

## VI. SENTENCING

As noted earlier in this opinion, defendant moved this Court to remand for resentencing in light of *Lockridge*, ___ Mich at ___. Our review of the record convinces us that remand is not required.

At the outset, we note that defendant does not argue on appeal that the trial court erred in its scoring of any OVs. That is, defendant does not argue that the court's factual findings in scoring OVs 13 and 16 were clearly erroneous or not supported by a preponderance of the evidence. A trial court's scoring of OVs must be supported by a preponderance of the evidence; we review the trial court's findings of fact for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Rather, defendant merely argues on appeal that the facts supporting the scoring of these OVs were not necessarily found by the jury or admitted by defendant, and that a remand is therefore required by *Lockridge*.

We reiterate that judicial fact-finding remains an important component of Michigan's sentencing scheme post-*Lockridge*. Although the sentencing guidelines are no longer mandatory, "they remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Lockridge*, ___ Mich at ___ (slip op at 13). *Lockridge* simply requires that where,

as here, a trial court was not aware at the time of sentencing that the sentencing guidelines were advisory, we consider whether OVs were scored based on facts necessarily found by the jury or admitted by defendant, and whether, applying *Lockridge*, a remand is required.[7]

We conclude that a remand is not required in this case. We do agree that the scoring for OV 16 was not based on facts admitted by defendant or necessarily found by the jury; however, the scoring of OV 13 was based on facts admitted by defendant. Because, as explained below, removing the 5 points scored for OV 16 from defendant's OV score would not alter his minimum guidelines range, defendant has not made a threshold showing of plain error.

In *Lockridge*, the Supreme Court held that in order to avoid any Sixth Amendment violations, Michigan's sentencing guidelines scheme was to be deemed advisory, instead of being mandatory. *Id*. at __ (slip op at 28). The concern is that when a judge makes findings of fact "beyond facts admitted by the defendant or found by the jury" in a sentencing proceeding that increases a defendant's minimum sentence, this runs afoul of a defendant's right to a jury trial. *Id*. at __ (slip op at 1). As a result, the guidelines no longer can be considered mandatory, but sentencing judges must consult the guidelines and " 'take them into account when sentencing.' " *Id*. at __ (slip op at 28), quoting *United States v Booker*, 543 US 220, 264; 125 S Ct 738; 160 L Ed 2d 621 (2005).

In determining whether there is any plain error under this new scheme, the first inquiry is whether the facts admitted by the defendant and the facts necessarily found by the jury "were sufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced." *Id*. at __ (slip op at 32). If the answer is "yes," then a defendant cannot establish any plain error. *Id*. at __ (slip op at 32). If the answer is "no," then a remand to the trial court is required to allow it to determine whether, now aware of the advisory nature of the guidelines, the court would have imposed a materially different sentence. *Id*. at __ (slip op at 34). If the court determines that it would have imposed a materially different sentence, then it shall order resentencing. *Id*. at __ (slip op at 34).

In this case, defendant objected to the scoring of OV 16 (value of stolen property) at sentencing; further, because the jury was only required to find that defendant intended or did commit a larceny, not a larceny of a specific value, facts supporting this score were not necessarily found by a jury. See MCL 750.110a(3). They also were not admitted by defendant.

---

[7] Indeed, sentences imposed by trial courts post-*Lockridge* (knowing of the advisory nature of the sentencing guidelines) will not require the consideration we must give the instant case. See *Lockridge*, ___ Mich at ___, slip op at 13 ("Because sentencing courts will hereafter not be *bound* by the applicable sentencing guidelines range, this remedy cures the Sixth Amendment flaw in our guidelines scheme . . . . Sentencing courts must, however, continue to consult the applicable guidelines range and take it into account when imposing a sentence.")

We thus agree that, in considering whether defendant can make a threshold showing of plain error,[8] the 5 points scored for OV 16 should first be subtracted from defendant's total OV score.

However, we disagree with defendant's contention that the scoring of OV 13 was not based on facts admitted by defendant. A score of 25 points for OV 13 must be supported by facts indicating that the sentencing offense was part of a pattern of felonious activity involving 3 or more crimes against a person within a five year period. See MCL 777.43(1)(c). Home invasion is a crime against a person. MCL 777.16f. The United States Supreme Court has recognized that a defendant's admission of a prior conviction satisfies the requirement that a sentencing enhancement be based on facts admitted by a defendant or found by a jury. See *Apprendi v New Jersey*, 530 US 466, 487; 120 S Ct 2348; 147 L Ed 2d 435 (2000) ("Because Almendarez-Torres had *admitted* the three earlier convictions for aggravated felonies--all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own--no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court."), citing *Almendarez-Torres v United States*, 523 US 224, 230; 120 S Ct 2348; 147 L Ed 2d 435 (2000). In this case, defendant had pled guilty in 2012 to two charges of home invasion related to offenses committed earlier in 2010 and 2011. Defense counsel stipulated to these convictions at sentencing in this case. More significantly, in pleading guilty to those crimes against a person, defendant admitted his commission of those crimes, and admitted the factual basis for his guilty pleas to those crimes, in "proceedings with substantial procedural safeguards of their own." *Apprendi*, 530 US at 487. Therefore, the facts underlying the scoring of OV 13 were admitted by defendant, and the points scored for OV 13 need not be subtracted in considering defendant's total OV score under *Lockridge*.

Reducing defendant's OV score by 5 points (by subtracting the score for OV 16) would not alter defendant's minimum sentencing guidelines range. Therefore, remand is not required under *Lockridge*. *Lockridge*, ___ Mich App at ___; slip op at 33.

Affirmed.

/s/ Mark T. Boonstra
/s/ Henry William Saad
/s/ Joel P. Hoekstra

---

[8] Our review of the record does not indicate, as indeed defendant does not argue on appeal, that the score for OV 16 was clearly erroneous or not supported by a preponderance of the evidence. *Hardy*, 494 Mich at 438.