*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 13, 2021

Plaintiff-Appellee,

v

No. 352532
Muskegon Circuit Court
LC No. 18-002506-FC

KAHLEK AMERE-RAHSHEE MCPHERSON,

Defendant-Appellant.

Before: MURRAY, C.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions of first-degree premeditated murder, MCL 750.316(1)(a); being a felon in possession of a firearm (felon-in-possession), MCL 750.224f; and carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to serve life imprisonment without the possibility of parole for his murder conviction, 5 to 10 years' imprisonment for his felon-in-possession conviction, and a consecutive two years' imprisonment for his felony-firearm conviction. For the reasons explained below, we affirm.

## I. BASIC FACTS

This case arises out of the shooting death of Corey Thompson. The prosecution presented evidence that defendant had some form of an altercation with Thompson and Thompson's brother on July 3, 2017. Later that night, defendant and two other persons approached Thompson while he was on the front porch of a home on Sanford Street in Muskegon, Michigan. Defendant shot Thompson in the head using a long-barreled silver revolver. Defendant and the two others then fled.

## II. MOTION FOR MISTRIAL

Defendant first argues that the trial court abused its discretion by denying him the opportunity to voir dire the jury after a disturbance in the courthouse occurred during his trial, and by denying defendant's motion for a mistrial related to the same. We disagree.

-1-

This Court reviews a trial court's decision on a motion for a mistrial for an abuse of discretion. *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017). This Court also reviews for an abuse of discretion the trial court's decision not to voir dire the jury after incidents arise. *People v Washington*, 468 Mich 667, 674; 664 NW2d 203 (2003). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019). This Court reviews de novo whether the trial court properly applied the law to the facts. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). A trial court necessarily abuses its discretion when its decision was premised on a misapplication of the law. *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017).

A trial court should only grant a motion for a mistrial when there has been an irregularity that was prejudicial to the defendant's rights and which impairs his or her ability to have a fair trial. *Dickinson*, 321 Mich App at 18. It is the moving party's burden to demonstrate that the irregularity was so egregious that it could be removed in no other way than by declaring a mistrial. *Id*.

During the defense's cross-examination of Officer Charles Anderson, the trial court excused the jury at 11:35 a.m. in order to hear arguments over an evidentiary objection. After the jury left the courtroom, the trial court asked the parties to be seated and invited defense counsel to respond to the objection. Defense counsel responded, but was interrupted by a disturbance that the court reporter noted occurred in the hallway outside the courtroom. The trial court authorized someone to respond to the disturbance and recessed court. When court resumed, the trial court overruled the objection and the jury returned. The next day defense counsel moved for a mistrial. Defense counsel referred to the disturbance and stated that it was widely publicized in media. He conceded, however, that he had no evidence that the jurors read any of the publicity about the incident. The prosecutor opposed the motion. He also stated that there was no evidence that any of the jurors were exposed to publicity about the incident and argued that the trial court could properly rely on the presumption that the jury had been following the court's instructions to avoid media coverage. The trial court agreed with the prosecutor. It stated that it had instructed the jury to avoid media coverage and to report it to the court if any of the jurors had heard or seen something about the case. The court stated that no jurors had come forward with such information. On those facts, the trial court decided not to further question the jurors and to deny the motion for a mistrial.

Indeed, the record indicates that the jury had already left the courtroom and that the court had resumed arguments before the disturbance occurred in the hallway. As such, there is no evidence that the jurors were actually exposed to the disturbance. The defense relied solely on the possibility that one or more jurors might have been exposed to information about the disturbance through media coverage. However, many criminal prosecutions involve media coverage, and the trial court had repeatedly instructed the jurors to avoid all media coverage about the trial. Juries are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Moreover, as this Court has stated, the fact that there has been extensive media coverage does not by itself warrant a midtrial voir dire of the jury. *People v Adams*, 245 Mich App 226, 240-241; 627 NW2d 623 (2001). The Court explained that a defendant is not entitled to voir dire the jury simply because he suspects that the jurors might have ignored the trial court's instructions:

-2-

Here, the request for a midtrial voir dire examination was made not on the basis of any suspected juror misconduct, but, rather, on the speculative possibility that juror misconduct might be revealed after trial. There is simply no indication that the jury ignored the trial court's repeated instructions to avoid publicity surrounding the case, nor was there any indication that the jury's impartiality had been compromised. Thus, there was no indication that any juror was improperly exposed to media coverage of the case. Therefore, the trial court did not abuse its discretion in denying defendant's request for a midtrial voir dire examination. [*Id.* at 241.]

The same is true here. Defense counsel identified no bases for questioning the integrity of the jurors.[1] Defendant's speculation did not give rise to grounds for interrogating the jury or granting a mistrial. See *id.* at 241. Accordingly, it was within the range of reasonable and principled outcomes for the trial court to refrain from exposing the jurors to additional voir dire on mere speculation. It was similarly within the range of reasonable and principled outcomes to deny the motion for a mistrial. See *Clark*, 330 Mich App at 415.

## III. JUROR MISCONDUCT

Defendant next argues that the trial court erred when it refused to excuse Juror 7 after it was revealed that the juror knew a witness. We disagree.

This Court reviews de novo whether the trial court properly applied the law applicable to jury selection. *People v Fletcher*, 260 Mich App 531, 554; 679 NW2d 127 (2004). This Court reviews the factual findings underlying the trial court's application of the law for clear error. *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *Id.* This Court reviews a trial court's handling of voir dire for an abuse of discretion. *People v Tyburski*, 445 Mich 606, 619; 518 NW2d 441 (1994) (opinion by MALLET, J.). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. See *Clark*, 330 Mich App at 415.

Defendant had the right to be tried by an impartial jury. *People v Rose*, 289 Mich App 499, 529; 808 NW2d 301 (2010). "A juror's failure to disclose information that the juror should have disclosed may warrant a new trial if the failure to disclose denied the defendant an impartial jury." *Id.* In order to warrant a new trial, defendant must show that there was a reasonable doubt about Juror 7's impartiality. See *id.*

---

[1] Again, there was no evidence that any juror heard or saw the disturbance. There was also no evidence concerning the nature of the disturbance and how it might have prejudiced a juror had he or she seen it. Instead, defendant merely speculates that a juror might have reviewed media coverage about the incident—in contravention of the court's instructions—and might have been prejudiced in some unknown way as a result.

On the fourth day of trial, the parties became aware that Juror 7 knew Detective Steven Irvine from church. Juror 7 told the court that she did not recognize the name when the prosecutor read the names of witnesses during voir dire, and she was shocked when Detective Irvine approached the stand to testify. She further stated that she did not know Detective Irvine that well and would still be fair and impartial. She said that she had attended the same church since she was a child, but she began working as an administrative assistant in the last year. She stated that she was not in any groups or on any committees with Detective Irvine, and she did not socialize with him.

After the juror answered those questions, defense counsel stated that it was a "close call" but asserted that the juror "should be excused because we think she should have revealed that initially." The trial court again asked Juror 7 if she believed that she could be a "fair and impartial juror," and she responded affirmatively. The trial court also inquired as to whether Juror 7 would automatically rule in the prosecution's favor on the basis of her attendance at the same church as the detective. The juror responded that she would not. The trial court accepted that Juror 7 did not at first recognize Detective Irvine's name, and also found Juror 7 credible when she stated that she could be fair and impartial. For that reason, it denied the request to excuse Juror 7.

We discern no clear error. See *Bryant*, 491 Mich at 595. The juror noted that she did not recognize Detective Irvine's name during voir dire, and that she only recognized him when he approached the stand to testify. It was reasonable for the trial court to accept that answer. The juror also asserted that she would continue to be fair and impartial. Given her limited interaction with Detective Irvine, there was no basis for questioning that assertion. Additionally, Juror 7 was presumed to be impartial, and Juror 7's statement that she would be fair and would not judge the officer's testimony on the basis of her limited interactions with him adequately protected defendant's rights. *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). On this record, there was no reasonable doubt as to whether Juror 7 would be impartial. See *Rose*, 289 Mich App at 529. As such, there was no basis for excusing Juror 7, and the trial court did not err when it refused to do so.

## IV. SUFFICIENCY OF THE EVIDENCE

Defendant next contends that the evidence was insufficient to support his convictions. We disagree.

"In challenges to the sufficiency of the evidence, this Court reviews the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

First-degree premeditated murder is second-degree murder with the added element of premeditation. *Clark*, 330 Mich App at 436. Accordingly, the prosecutor must prove that there was an intentional killing of a human and that the killing was done with premeditation and deliberation. *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). On appeal, defendant has not challenged whether someone killed Thompson or whether there was evidence that the killing was done intentionally with premeditation and deliberation. Instead, he challenges the sufficiency of the evidence identifying him as the person who killed Thompson. The identity of

the perpetrator is an element of every criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Accordingly, the prosecution had to present evidence that would be sufficient for a rational jury to find beyond a reasonable doubt that defendant was the person who shot and killed Thompson. *Roper*, 286 Mich App at 83.

Destiny Gallegos testified that she was dating defendant at the time of the shooting and said that he admitted to her that he was the person who shot Thompson. More specifically, she testified that defendant told her that he went up to Thompson, who was standing on a porch, and shot him once in the head with a revolver. Gallegos's testimony was alone sufficient to allow a rational jury to find beyond a reasonable doubt that defendant was the person who shot and killed Thompson. See *id*. Nevertheless, defendant argues that Gallegos's testimony could not be believed because she was a disgruntled former girlfriend.

It is not this Court's place to second-guess the jury's resolution of the dispute between Gallegos's testimony and defendant's testimony. Generally, unless a witness's testimony was so impeached as to deprive it of all probative value or was such that no reasonable jury could believe it, it is for the jury to determine the weight and credibility to be afforded the witness's testimony. *People v Lemmon*, 456 Mich 625, 642-644; 576 NW2d 129 (1998). Gallegos's testimony was neither so thoroughly impeached nor so implausible that no reasonable jury could believe her. Moreover, Gallegos testified about details that were corroborated by other evidence, which strongly suggested that she was telling the truth.

She stated that defendant came to the home where she was on the night at issue and was wearing black clothing, which included a hoodie. He also told her that others accompanied him to the shooting. These statements were consistent with the video evidence that showed three persons approaching Thompson, two of whom had on hoodies, and one of whom carried a long-barreled silver revolver. Gallegos's testimony that defendant said he walked up to Thompson on the steps and shot him once in the head was also consistent with the evidence from the scene of the shooting and the autopsy. She further described defendant as sweating and being out of breath, which was consistent with someone who had just run from the shooting and consistent with the video evidence that the last person moved from the scene of the shooting at a "heated" pace.

Gallegos also stated that she saw defendant with a silver revolver earlier that night, which was consistent with the one later recovered. She got the impression from a letter that defendant sent her from jail that the revolver was the weapon that he said he used to shoot Thompson. The video evidence showed a person carrying a pistol that was consistent with the revolver recovered from under the steps. The letter that defendant sent to Gallegos further corroborated that defendant had, in fact, confided to Gallegos that he was the shooter. Additionally, Gallegos testified that defendant provided a motive for the shooting: he felt that Thompson and Thompson's brother had been disrespectful during an earlier incident at the liquor store.

Moreover, we note that, even though Gallegos's testimony alone was sufficient to support the jury's verdict as to the element of identity, there was also additional evidence tending to support the jury's verdict. Ja'Kari Wilson testified that defendant implicated himself as the shooter while they were incarcerated together. Wilson said that defendant told him that police officers had recovered the gun with which he shot Thompson and that they also had a letter in which defendant told on himself. Although Wilson had a motive to fabricate testimony against defendant in order

to get a reduced sentence, Wilson also provided details that were independently corroborated. He stated, for example, that defendant identified the gun he used as a .44 "Bulldog" or "Dragon" with a long barrel, which was consistent with the firearms expert who identified the gun recovered from the location identified by defendant as its hiding place to be a "Virginian Dragoon." That weapon was also consistent with the video evidence showing the likely shooter holding a long-barreled silver revolver. Wilson similarly stated that defendant told him that police officers had a letter in which he implicated himself, which was independently verified by the admission of the letter. Consequently, Wilson's testimony was also not so incredible that no rational jury could rely on it to find beyond a reasonable doubt that defendant was the shooter. See *id*.

There was also strong circumstantial evidence that would support a finding beyond a reasonable doubt that defendant was the perpetrator. The prosecution may establish the elements of a crime through circumstantial evidence. See *People v Hardiman*, 466 Mich 417, 422; 646 NW2d 158 (2002). When evaluating a challenge to the sufficiency of the evidence, this Court must consider the inferences that can be fairly drawn from the evidence in the light most favorable to the prosecution. See *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Further, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *Hardiman*, 466 Mich at 428. In such cases, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and determine the weight to be accorded those inferences." *Id.*

The prosecution presented evidence that Thompson had died after he suffered a single shot to the head. Thompson's girlfriend testified that she saw a man in a hoodie crossing a field just moments after Thompson likely had been shot. Video evidence showed three men approaching Thompson's location at the time of the shooting. Two of the men wore hoodies, and one of the men wearing a hoodie could be seen carrying what appeared to be a long-barreled silver revolver. The video evidence then showed the men returning from the vicinity of the location where Thompson had been shot just minutes later.

The prosecution also admitted a letter, which was written in longhand. A handwriting expert opined that the handwriting on the letter matched a known handwriting sample by defendant. In the letter, the author described in detail where a revolver could be found. The location of the revolver was associated with the sister of defendant's best friend. The revolver was recovered and admitted at trial. The author also asked Gallegos to wipe down and sell the weapon.

A reasonable jury examining this evidence as a whole could infer that defendant wrote the letter. From that, it could further infer that he hid the silver revolver and asked Gallegos to wipe it down and get rid of it because he used the weapon to shoot Thompson and feared that the revolver could implicate him in the shooting. Given those inferences, the jury could also infer that the video evidence showed the revolver at issue and could infer that the person carrying the revolver was defendant. Consequently, when all the possible inferences are taken in the light most favorable to the prosecution, there was adequate evidence to support the jury's verdict even without the testimony by Gallegos and Wilson. See *Hardiman*, 466 Mich at 428; *Wolfe*, 440 Mich at 514-515. Moreover, when combined with the witnesses' testimony, there was overwhelming evidence to support the jury's verdict that defendant was the man who shot and killed Thompson.

## V. OTHER-ACTS EVIDENCE

Defendant next argues that the trial court erred when it allowed Somalia Betancourt to testify that defendant robbed her and sexually groped her at gunpoint two days after Thompson was killed. While we agree the trial court erred because it failed to analyze the admissibility of the evidence under the proper framework, we conclude that the evidence was nonetheless admissible and the trial court's error was harmless.

This Court reviews a trial court's decision whether to admit evidence for an abuse of discretion. *Clark*, 330 Mich App at 431. A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Id*. at 415. This Court reviews de novo whether the trial court properly applied the rules of evidence. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). A trial court necessarily abuses its discretion when it admits evidence that was inadmissible as a matter of law. *Id*.

Although character evidence might be relevant to a fact at issue, the rules of evidence place strict limits on the use of character evidence at trial. See *Roper*, 286 Mich App at 91. This is so because there is a significant danger that the jury will overestimate the probative value of the character evidence. *Id*. Accordingly, the rules of evidence generally preclude the admission of character evidence to prove "action in conformity therewith." MRE 404(a). Similarly, a party may not admit evidence concerning "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1).

Before trial, defendant moved to prevent the prosecution form calling Betancourt to testify about the above-referenced robbery because it was inadmissible other-acts evidence under MRE 404(b). The prosecution responded that Betancourt's testimony was not subject to MRE 404(b). The prosecutor explained that defendant so intertwined these two incidents that the incident involving Betancourt ceased to be an "other" crime within the meaning of the rule. The prosecutor also argued that Betancourt's testimony was necessary to establish that defendant was in fact the author of the letter, which would be a proper purpose under MRE 404(b). The trial court concluded that Betancourt's testimony was "intrinsic within everything that is going on in this; and therefore, that will be allowed." The court did not analyze whether Betancourt's testimony would be admissible under MRE 404(b).

On appeal, the prosecution continues to assert that Betancourt's testimony was not subject to MRE 404(b) because it was "intrinsic" evidence—that is, direct evidence of the conduct at issue. In determining whether MRE 404(b) applies to evidence, our Supreme Court has rejected the contention that there is a so-called "res gestae" exception to the prohibition stated under MRE 404(b). *People v Jackson*, 498 Mich 246, 268; 869 NW2d 253 (2015). The Court opined that a test that depended on ascertaining whether the evidence of the other acts were so inextricably intertwined with the acts at issue or were otherwise necessary to complete the picture was one that threatened to erode the scope and protections afforded by MRE 404(b). *Id*. at 266-268. The Court went on to state that MRE 404(b) applies to all evidence of crimes, wrongs, or acts other than the conduct involved in the crimes at issue, which might give rise to a character-to-conduct inference. *Id*. at 269. Therefore, the relevant inquiry is whether Betancourt's testimony involved the conduct at issue in the charged crimes or involved evidence of other crimes, wrongs, or acts that might give rise to a character-to-conduct inference.

Betancourt did not offer any testimony concerning the shooting at issue or events related to the shooting. Instead, Betancourt offered testimony about acts that clearly encompassed other crimes, wrongs, or acts. Specifically, she described an armed robbery and sexual assault that occurred two days after the shooting. Consequently, the trial court erred to the extent that it concluded that it did not need to determine whether Betancourt's testimony was admissible under the framework provided by MRE 404(b). See *id*. Nevertheless, the trial court's failure to analyze the admission of the evidence under MRE 404(b) may be harmless if the evidence was substantively admissible under MRE 404(b). See *id*. at 269-272.

In order for evidence of other crimes, wrongs, or acts to be admissible consistent with MRE 404(b), the prosecutor must offer the evidence for a purpose other than to prove a character-to-conduct or propensity theory. *Yost*, 278 Mich App at 402. The prosecutor must next establish that the evidence is relevant and admissible to prove a fact of consequence at trial. Finally, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice under MRE 403. *Id*. at 402-403.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 404(b)(1) lists several purposes other than an improper character-to-conduct theory for which other-acts evidence may properly be admitted: other-acts evidence may be admissible to prove "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1). However, the list is not exhaustive. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). Indeed, the prosecutor may admit evidence of other crimes, wrongs, or acts for any purpose "other than the establishment of a defendant's character and his propensity to commit the offense." *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 724 (2005). One proper purpose is to bolster a witness's credibility. *Id*. at 466.

At trial, Gallegos was the prosecution's key witness; she testified that defendant admitted that he shot and killed Thompson. The defense responded by arguing that Gallegos was not credible and was motivated to retaliate against defendant for his infidelity. The prosecution also presented a letter that it alleged defendant wrote and sent to Gallegos. In the letter, the author asked Gallegos to take steps to get rid of the silver revolver and wipe it clean of prints. The author also asked Gallegos to pay off Betancourt in order to get her to refrain from testifying. The letter was important corroboration of Gallegos's testimony, but it was not on its face clear that defendant wrote the letter because the author used an alias.

Gallegos testified that she recognized that defendant wrote the letter on the basis of certain clues in the letter and his handwriting, but it was important for the prosecution to demonstrate that defendant was in fact the author without relying entirely on Gallegos's identification. One way to establish defendant's identity as the author was to call Betancourt to testify about the incident that she had with defendant. The details of that incident provided necessary context to understanding the statements that the author made in the letter about the incident with Betancourt and established that defendant was most likely the letter's author given the details that were recited in the letter. As such, Betancourt's testimony was admitted for the proper purpose of bolstering Gallegos's identification of defendant as the author. See *id*.

Betancourt's testimony also enhanced Gallegos's credibility in other ways. Betancourt described the gun that defendant used when he robbed her as a small black revolver. Yet the evidence from Thompson's shooting just two days earlier showed that the man who shot Thompson carried a long-barreled silver revolver. Gallegos testified that defendant gave the long-barreled silver revolver to a person identified as "Rob G" to get rid of, and that defendant got a new revolver. Betancourt's testimony about the smaller revolver added weight and credibility to Gallegos's testimony that defendant got rid of the silver revolver on the night at issue and procured a new revolver, which was an additional basis for admitting the other-acts testimony. See *id.*

Whether Gallegos implicated defendant in the shooting only out of anger over his infidelity was also a significant factor at trial. Defendant testified that he did not shoot Thompson, and so the jury had to determine whether Gallegos was credible when she testified that defendant confessed to her. Gallegos's testimony that defendant also told her that he took money from Betancourt and felt around Betancourt's breasts to search for money was important corroboration of defendant's tendency to confide in Gallegos. Betancourt's testimony about the events provided context with which the jury could evaluate whether Gallegos was relating details that she learned from defendant or fabricating her claims. Betancourt's testimony tended to show that Gallegos's testimony accurately related details that would only have been known to the perpetrator of both crimes and demonstrated that the author of the letter was likely the perpetrator of both crimes discussed in the letter. That is, when considered together with Gallegos's testimony and the letter, Betancourt's testimony tended to permit an inference that defendant was the person who shot Thompson.

The prosecution did not offer Betancourt's testimony to establish an improper character-to-conduct theory. See *Roper*, 286 Mich App at 92. Rather, the prosecution offered the testimony to establish that defendant was the author of the letter to Gallegos and to show that defendant himself asked Gallegos to take steps to interfere with the investigation into the shooting of Thompson and the robbery of Betancourt, which—taken together—constituted evidence identifying defendant as the shooter. See MRE 404(b)(1) (stating that other acts may be admitted to establish identity). Betancourt's testimony about the details of the robbery and sexual assault also provided context that made it more likely that Gallegos was accurately relating details that defendant confided to Gallegos. Evidence of other crimes, wrongs, or acts may properly be admitted to bolster the weight and credibility of another witness's testimony. See *Johnigan*, 265 Mich App at 465. Betancourt's testimony was also relevant and admissible to establish that defendant authored the letter sent to Gallegos, to reinforce Gallegos's testimony that defendant confided with her the details of his criminal episodes, and to bolster Gallegos's claim that defendant got rid of the long-barreled silver revolver. See MRE 401; MRE 402.

We further conclude that the probative value of the other-acts evidence was not outweighed by the danger of unfair prejudice. See MRE 403. To be unfairly prejudicial, the evidence must be more than merely damaging to the defendant's case. *People v Cowhy*, 330 Mich App 452, 467-468; 948 NW2d 632 (2019). To warrant exclusion, the evidence must be such that there is a tendency that the jury will give the evidence undue or preemptive weight. *Id.* at 468. Betancourt's testimony implicated defendant's propensity to commit crimes, but it was also probative of whether defendant authored the letter and was important corroborative evidence to Gallegos's testimony. Taken as a whole, it cannot be said that the "probative value" of this evidence was

"*substantially* outweighed by the danger of unfair prejudice." MRE 403 (emphasis added). Consequently, Betancourt's testimony was substantively admissible under MRE 404(b).

Although the trial court did not analyze the admission of the evidence under the framework applicable to MRE 404(b), Betancourt's testimony was substantively admissible under that framework. Additionally, the prosecution originally argued that the evidence was admissible as intrinsic evidence and also under MRE 404(b). The prosecution also identified a proper theory for the admission of Betancourt's testimony and demonstrated how the evidence was relevant even before trial. Likewise, as required under MRE 404(b)(2), the prosecution gave the defense notice of its intent to use the other-acts testimony. Under these circumstances, the trial court could have and should have admitted the evidence consistent with the prosecution's stated grounds for admission under MRE 404(b). Consequently, the trial court's failure to analyze the admission of Betancourt's testimony under MRE 404(b) was harmless. See *Jackson*, 498 Mich at 269-272.

## VI. JURY COMPOSITION

Defendant lastly argues that he was denied his right to an impartial jury because black witnesses were systemically excluded from the jury venire. We disagree.

To preserve a claim that the composition of the jury reflected systemic exclusion of a distinct group, the defendant must challenge the jury composition before the trial court. *People v Jackson*, 313 Mich App 409, 428; 884 NW2d 297 (2015). Defendant did not object to the composition of the jury during voir dire. Indeed, he expressed satisfaction with the jury. He also did not raise any claims concerning the jury composition by motion in the trial court. Therefore, this claim of error has not been preserved for appellate review. See *id*.

This Court reviews de novo whether a defendant was denied his right to have an impartial jury drawn from a fair cross section of the community. *Bryant*, 491 Mich at 595. This Court reviews the factual findings underlying the trial court's application of the law for clear error. *Id*. Because defendant did not preserve this claim of error for appellate review, this Court's review is limited to determining whether there was plain, outcome-determinative error. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish plain error that warrants relief, defendant must show that the trial court made a plain or obvious error and that, but for the error, the outcome would have been different. See *id*.

"The Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the community." *Bryant*, 491 Mich at 595. To make a prima facie case that his right to an impartial jury drawn from a fair cross section of the community was violated, defendant must show that a distinctive group was excluded from the pool of jurors, that the representation of that group was not fair and reasonable in relation to the number of such persons in the community, and that the underrepresentation was caused by systemic exclusion of the group during the jury selection process. *Id*. at 597.

On appeal, defendant asserts that the impaneled jurors were all white, and that the same must have been caused by systemic exclusion of black jurors because more than 14% of the residents of Muskegon County are black. Notably, defendant has not presented any evidence that his jury was composed entirely of white jurors. As such, he has not established the factual

-10-

predicate of his claim that black jurors were systematically excluded. See *Jackson*, 313 Mich App at 429-430. Even assuming that he could establish that the jury did not include any black jurors, he still has not shown plain error.

Our Supreme Court has held that a trial court must examine reliable data and determine the composition of jury pools and venires over time when examining whether there is evidence of systemic exclusion. *Bryant*, 491 Mich at 599-600. Accordingly, it is not sufficient for the defendant to present evidence that his or her jury did not include members of a distinctive group or even that the entire venire did not include such persons. *Id*. at 600 (stating that there must be evidence of exclusion over a significant period). This is so because "underrepresentation in a single venire could result from chance." *Id*. at 602. Defendant has not presented any evidence that black jurors were excluded from his venire, or that they were otherwise generally underrepresented in Muskegon County's venires. See *Jackson*, 313 Mich App at 429-430. Consequently, defendant has not identified a plain error that warrants relief. See *Carines*, 460 Mich at 763.

Affirmed.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

-11-