*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

JAMES EDWARD LOCKMILLER,

        Defendant-Appellant.

UNPUBLISHED
November 19, 2020

No. 348184
Calhoun Circuit Court
LC No. 2017-003699-FH

Before: MARKEY, P.J., and METER and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) (sexual contact by a defendant over 17 years old with a victim under 13 years old). The trial court sentenced defendant to 38 months to 15 years' imprisonment. We affirm his conviction but vacate his sentence and remand for resentencing.

## I. FACTUAL BACKGROUND

This case arose from allegations that defendant had sexual contact with a nine-year-old boy. At trial, the victim testified that defendant was his second cousin and that he looked up to defendant as a kind of hero because he trusted defendant. The victim stated that he often visited the Hidden Hills Campground with his mother and his younger brother during the summer. According to the victim, sometime in August 2016 he spent the night at his great-aunt's and great-uncle's camper at the Hidden Hills Campground with defendant. The victim testified that his great-aunt, great-uncle, and defendant's daughter slept in the bedroom of the camper out of eyesight while he played video games and watched movies on the couch with defendant until after midnight.

The victim stated that defendant eventually began watching a video of people having sex on his phone. The victim testified that the video depicted a man and woman "messing with each other's private part." The victim testified that defendant started touching himself while watching the video. The victim stated that, next, defendant stood up with "his pants still up but his penis hanging out" and forced the victim to touch defendant's penis. The victim stated that defendant

placed his hand on the victim's hand and forced the victim's hand to move up and down while touching defendant's penis.

The victim testified that defendant then made the victim stand up and tried to touch the victim's penis, but the victim would not let defendant touch his penis. The victim stated that he was scared during this incident and did not call for help because he was afraid of defendant. The victim testified that the incident ended when he told defendant that he needed to use the bathroom. When asked if defendant said anything to the victim, the victim responded as follows:

> *A.* He said okay when I said I had to go to the bathroom.
>
> *Q.* Okay. And did he ever talk to you about telling anybody about what was going on that night?
>
> *A.* He said, "Don't tell anyone or I will kill you or hurt you".
>
> *Q.* Did you believe him?
>
> *A.* Yes.

The victim testified that he felt scared for a while after the incident, but he did not tell anyone what happened until about a year later. The victim stated that he told his mother what happened while they were at the same campground the following year; his younger brother went to defendant's camper, and the victim was scared that defendant would do the same thing to his brother. The victim's mother also testified that the victim told her about the incident after he saw his younger brother getting close to defendant. The victim's mother stated that she was watching her sons play at the campground when she saw the victim's younger brother walk over to defendant. According to the victim's mother, the victim had a look of "pure fear on his face for his brother" as his little brother walked toward defendant.

Detective Douglas A. Betts, a retired investigator for the Battle Creek Police Department, testified at trial that he was assigned to investigate this case and set up an appointment for the victim to participate in "a forensically formatted interview with a specially trained interviewer," as was normal for cases involving younger victims. Detective Betts stated that he watched a video of the forensic interview that was conducted by a forensic interviewer who knew "how to talk to kids without coaching, leading, or anything like that. It's the best—that's why they call it a forensic interview. It's just the best way to get the most correct information out of a kid at that time." Detective Betts testified that, after the forensic interview, he took a video recording of the interview "back to the police department because [the tape was] considered evidence."

Elizabeth Walters, a forensic interviewer for Sexual Assault Services at the Child Advocacy Center, testified that it was her job to conduct forensic interviews of children when allegations of sexual or severe physical abuse were made, and she described the details of the forensic interviewing protocol at trial. Walters explained that a forensic interview is a structured conversation intended "to obtain a statement from a child about something that they may have experienced or witnessed." Walters stated that the interview is "done in a child centered, developmentally sensitive, non-biased, truth seeking manner in order to make fair and accurate

decisions." Walters further explained that "forensic interviewing is hypothesis testing not hypothesis confirming. So [they] want to look at what other things could be going on." Walters testified that she conducted a forensic interview with the victim following these protocols, and the victim made disclosures. When asked if she could guarantee that a child told the truth, Walters stated that she did her best, but she was "not a human lie detector test."

Defendant was charged with CSC-II in relation to the victim's allegation. At the beginning of his jury trial, the trial court explained that the prosecutor and defense counsel would make closing arguments after all the evidence was presented and instructed the jurors that the closing arguments were "not evidence. They [were] only meant to help [the jurors] understand the evidence and the way each side sees the case. [The jurors] must base [their] verdict only on the evidence." During closing arguments, the prosecutor stated in part as follows:

> I think that if [the victim's brother] hadn't gone over and [the victim] saw what might happen we probably wouldn't know about what happened to this day. But [the victim] being the brave kid that he is stood up and said I need to do something about this and I need to put my fear aside and protect my younger brother.

> \* \* \*

> In my eyes [the victim] [w]as a hero. The only reason why he did this was to protect his brother because he didn't want this to happen to someone else. So then he put his fear of being hurt, of being threatened, being embarrassed which he said he was, being judged which he felt he might be, he put that aside and came forward.

After the parties made their closing arguments, the trial court again instructed the jury that "[m]any things are not evidence and you must be careful not to consider them as such. . . . The lawyers['] statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories." The jury convicted defendant of CSC-II, and the trial court sentenced defendant to 38 months to 15 years' imprisonment.

According to defendant's Presentence Investigation Report (PSIR), defendant's minimum sentencing guidelines range was 19 to 38 months' imprisonment. Defendant was assessed 50 points for offense variable (OV) 7 because defendant "threatened to hurt the victim or his family if he told anyone about the assault" and 10 points for OV 10 because defendant exploited the victim's young age. At sentencing, defendant objected to the scoring of OV 7 at 50 points, arguing that he believed it should be scored zero points because the alleged threat that he made to hurt the victim or his family if the victim told anyone what happened "was not done during the offense. It was not meant to heighten [the victim's] fear, anxiety during the offense. It was something that was said afterwards." The trial court rejected defendant's argument and determined that OV 7 was properly scored because the incident and the threat were "all encompassing. He was still there. It was in relation clearly to the conduct and directing [the victim] and placing him in fear that if he did tell anybody that eventually there would be harm that came to them."

Defendant now appeals his jury trial conviction and the sentence imposed by the trial court.

## II. IMPROPER OPINION TESTIMONY

First, defendant argues that Walters and Detective Betts improperly vouched for the credibility of the victim by testifying about the efficacy of forensic interviewing protocol and that defense counsel was ineffective by failing to object to the improper testimonies. We disagree.

Because defendant did not object to the admission of Walters's or Detective Betts's testimonies regarding forensic interviewing at trial, defendant's arguments regarding the admissibility of their testimonies were not preserved for appellate review. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Therefore, our review is limited to plain error. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under plain-error review, defendant bears the burden to show that an error occurred, it was clear or obvious, and it affected substantial rights. *Id*. An error affects substantial rights when it caused prejudice or "affected the outcome of the lower court proceedings." *Id*.

"[I]t is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). Credibility determinations are to be made by the jury, not another witness. *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). For example, a witness may not testify that a child victim of sexual abuse was not coached, that the victim "was being truthful," or that the victim's "allegations had been substantiated." See *People v Douglas*, 496 Mich 557, 570, 583; 852 NW2d 587 (2014) (quotation marks and citations omitted). In *Douglas*, when a forensic interviewer and Children's Protective Services investigator each gave testimony to this effect, this Court determined that the testimonies constituted improper vouching because the witnesses "directly and conclusively opined that [the victim]'s allegations in [that] case were true and trustworthy." *Id*. at 583 n 8.

However, this Court distinguished between the improper vouching testimonies in *Douglas*, and a police officer's testimony that "there was no indication that the victim had been coached" in *People v Sardy*, 313 Mich App 679, 721-723; 884 NW2d 808 (2015), vacated in part on other grounds by 500 Mich 887 (2016). Before the police officer in *Sardy* testified that there was no indication of coaching, the officer "explained the methods used and questions asked by forensic interviewers in attempting to determine whether an alleged child CSC victim had been subjected to coaching, noting the signs that suggest a child had been coached." *Id*. at 721. The *Sardy* Court opined as follows:

> In our view, giving an opinion that there was no indication that a child CSC victim was coached based on forensic-interview training, experience, education, and the totality of the of the circumstances . . . is not the equivalent of opining that the victim was credible or telling the truth. Indeed, we believe that there is also a distinction between testifying that a child victim had not ben coached, like the definitive conclusion made by the forensic interviewer in *Douglas*, . . . and testifying that there is no indication that a child victim was coached, as opined by the officer in this case. [*Id*. at 723.]

Moreover, the *Sardy* Court determined that, even if the police officer's testimony that there was no indication of coaching was improper, the rest of the officer's testimony regarding forensic interviewing protocol was appropriate. *Id*.

Recently, in *People v Thorpe*, 504 Mich 230, 259; 934 NW2d 693 (2019), the Michigan Supreme Court determined that an expert improperly vouched for the credibility of a child victim when he testified "that only 2% to 4% of children lie about sexual abuse" and then "identified only two specific scenarios in his experience when children might lie, neither of which applie[d] in [that] case." Our Supreme Court explained that, "although he did not actually say it, one might reasonably conclude on the basis of [the expert]'s testimony that there was a 0% chance [the victim] had lied about sexual abuse." *Id*.

In this case, defendant likens Walters's and Detective Betts's testimonies regarding forensic interviewing protocol to the expert's testimony in *Thorpe*, claiming that the testimonies "had the effect of vouching for the [victim]'s credibility." Specifically, defendant argues that the "mere fact that [a forensic] interview took place and the prosecution proceeded with the charges [made it] clear that [Walters] and [Detective Betts] concluded that the allegations were true," and this implication constituted improper vouching. However, defendant's argument fails because this Court has previously determined that testimony regarding forensic interviewing protocol in general does not constitute improper vouching testimony. See *Sardy*, 313 Mich App at 723. Moreover, unlike the expert witness in *Thorpe*, neither Walters nor Detective Betts commented on the actual statements made by the victim during the forensic interview. See *Thorpe*, 504 Mich at 259. The only time that the victim's statements were even mentioned was when Walters agreed that defendant made disclosures during a properly conducted forensic interview. Therefore, Walters's and Detective Betts's testimonies can also be distinguished from the improper testimony in *Douglas* that directly and conclusively vouched for the truthfulness and trustworthiness of the victim's allegations. See *Douglas*, 496 Mich at 583 n 8.

Additionally, the victim admitted that he lied and did not disclose everything during the forensic interview. Specifically, the victim admitted that he incorrectly informed Walters during the forensic interview that, when he touched defendant's penis, he did not touch any skin, but then testified at trial that he actually touched defendant's naked penis. The fact that the victim admitted that he was not completely truthful during the forensic interview indicated that the forensic interviewing protocol, although truth seeking, did not always obtain the truth. Because Walters and Detective Betts only discussed forensic interviews generally, making no claims regarding how effective forensic interviews actually were at obtaining truthful statements from child victims, and did not comment on the statements made by the victim during his forensic interview, their testimonies did not explicitly or implicitly vouch for the credibility of the victim in this case.

Defendant's claim of ineffective assistance of counsel for failing to object to Walters's and Detective Betts's testimonies similarly fails. See *People v Crews*, 299 Mich App 381, 401; 829 NW2d 898 (2013) (holding that defense counsel cannot be ineffective for "failing to make a futile objection"). Because neither Walters nor Detective Betts vouched for the credibility of the victim, defense counsel was not ineffective by failing to make a futile objection to their proper testimonies regarding forensic interviewing protocol. See *id*.

### III. PROSECUTORIAL MISCONDUCT[1]

Next, defendant argues that the prosecutor committed misconduct by referring to the victim as "brave" and "a hero" during closing arguments, thereby, improperly appealing to the jury's sympathy for the victim, and that defense counsel was ineffective by failing to object to the prosecutor's inappropriate comments. We disagree.

We review this unpreserved issue of prosecutorial misconduct for plain error affecting substantial rights because defendant did not object to the prosecutor's statements during closing arguments. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). Reversal is not warranted for instances of prosecutorial misconduct when a curative instruction could have alleviated the prejudicial effects of the error. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. (citations omitted).

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *Brown*, 294 Mich App at 382-383. The existence of misconduct is determined on a case-by-case basis by examining the record to "evaluate a prosecutor's remarks in context." *Id*. at 383. "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial." *Unger*, 278 Mich App at 236. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial." *Dobek*, 274 Mich App at 64. A prosecutor may argue all reasonable inferences that arise from evidence offered at trial, "and need not confine argument to the blandest possible terms." *Id*. at 66. However, a prosecutor may not simply make a statement urging the jury to convict the defendant on the basis of sympathy for the victim. *Unger*, 278 Mich App at 237.

In *Unger*, this Court determined that, although the prosecutor made improper statements during closing arguments, the statements were "brief and did not likely deflect the jury's attention from the evidence presented." *Id*. Moreover, the trial court instructed the jury that the statements and arguments made by the attorneys were not evidence, and this Court determined that "a timely objection and curative instruction could have alleviated any prejudicial effect." *Id*. Therefore, the *Unger* Court held that the prosecutor's improper statements did not deny the defendant a fair trial or affect the trial's outcome. *Id*.

In this case, the prosecutor described the victim as "brave" and "a hero" during closing arguments. Although such descriptions arguably might cause a jury to have sympathy for the victim, the prosecutor's comments must be evaluated in context of the arguments made and

---

[1] "[A]lthough the term prosecutorial misconduct has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are better and more fairly presented as claims of prosecutorial error, with only the most extreme cases rising to the level of prosecutorial misconduct." *People v Jackson*, 313 Mich App 409, 425 n 4; 884 NW2d 297 (2015) (quotation marks and citation omitted). For clarity and consistency's sake, and because it has become a term of art, we will utilize the term "prosecutorial misconduct."

evidence introduced throughout the trial. See *Brown*, 294 Mich App at 383; *Dobek*, 274 Mich App at 64. The prosecutor's statements regarding the victim being "brave" and "a hero" were fairly related to the victim's and his mother's testimonies at trial indicating that the victim was afraid to disclose defendant's abuse because defendant threatened to hurt the victim if he told anyone and that the victim only decided to tell his mother about the incident after he saw his younger brother with defendant. In light of this evidence, it was reasonable for the prosecutor to argue that the victim was brave for overcoming his fear of defendant by telling his mother about the abuse and that the victim was a hero for making the disclosure to protect his younger brother from a similar fate. *Dobek*, 274 Mich App at 64. When examined in context of the prosecutor's overall closing arguments and the evidence introduced at trial, it does not appear that the prosecutor made the comments about the victim being "brave" and "a hero" simply to seek sympathy for the victim, rather the statements constituted reasonable inferences supported by evidence in the record.

However, to the extent that the prosecutor's statements constituted an improper appeal to the jury's sympathy, any prejudice could have been alleviated by "a timely objection and curative instruction." See *Unger*, 278 Mich App at 235, 237. As in *Unger*, the prosecutor's statements in this case were "brief and did not likely deflect the jury's attention from the evidence presented." See *id*. at 237. Moreover, the trial court instructed the jury at the beginning and end of trial that the lawyers' statements and arguments were not evidence, and the jury was presumed to have followed this instruction. See *id*. at 235. Therefore, the prosecutor's closing statements did not deny defendant a fair trial or affect the outcome of the proceedings. See *id*. at 237. Moreover, defense counsel was not ineffective for failing to make a futile objection to the prosecutor's appropriate closing arguments. See *Crews*, 299 Mich App at 401.

## IV. OFFENSE VARIABLES

Lastly, defendant argues that the trial court erroneously scored OVs 7 and 10. We find that the trial court's 10-point assessment for OV 10 was proper but agree that the trial court erred by assessing 50 points for OV 7.

When a sentence is within the applicable sentencing guidelines range, it is only appealable if there was a scoring error or the trial court relied upon inaccurate information in determining the sentence. *People v Kimble*, 470 Mich 305, 310-311; 684 NW2d 669 (2004). The trial court must support its factual determinations by a preponderance of the evidence, and this Court reviews those determinations for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). When "[t]here was record evidence permitting an inference" that a variable was properly scored, this Court should uphold the trial court's determination for that variable. *People v McFarlane*, 325 Mich App 507, 536; 926 NW2d 339 (2018). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438. If the sentence is within the appropriate minimum guidelines range, a defendant is not entitled to resentencing unless the trial court relied on inaccurate information or a sentencing error occurred. *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006).

## A. OV 7

The trial court erred in the scoring of OV 7 because the alleged threat that defendant made to the victim did not occur during the sentencing offense and did not rise to the level of conduct similarly egregious to sadism, torture, or excessive brutality.

"OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase [a victim's] fear by a substantial or considerable amount." *People v Rodriguez*, 327 Mich App 573, 578; 935 NW2d 51 (2019) (quotation marks and citations omitted; alteration in original). A trial court may assess 50 points for OV 7 if the defendant engaged in "conduct similarly egregious to sadism, torture, or excessive brutality that was designed to substantially increase the fear and anxiety a victim suffered during the offense." *Id*. at 579 (quotation marks and citations omitted). In *Rodriguez*, this Court determined that the defendant's act of threatening to harm the victim of an unarmed robbery, without more, did not "rise to the level of egregious conduct similar to sadism, torture, or excessive brutality designed to substantially increase [the victim]'s fear and anxiety." *Id*. at 581.

Additionally, only conduct that occurred during the sentencing offense may be scored under OV 7. *People v Thompson (On Remand)*, 314 Mich App 703, 711; 887 NW2d 650 (2016). In *Thompson*, this Court determined that the trial court improperly relied on "conduct engaged in by [the] defendant throughout [a] two-year period of the sexual abuse, instead of confining its examination to conduct occurring during the sexual assault" that constituted the sentencing offense. *Id*. Similarly, in *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009), the Michigan Supreme Court determined that it was erroneous to consider "the entire criminal transaction and [to use] defendant's conduct after the crime was completed as the basis for scoring OV 9," which, like OV 7, also limits the conduct that may be scored to conduct occurring during the sentencing offense.

In this case, the sentencing offense was CSC-II. Therefore, any conduct occurring after the sexual contact between defendant and the victim was not part of the sentencing offense and could not be considered when scoring OV 7. See *McGraw*, 484 Mich at 133; *DeLeon*, 317 Mich App at 719; *Thompson*, 314 Mich App at 711. The victim's testimony at trial was not clear regarding *when* he claimed that defendant threatened to kill or hurt him if he told anyone about the incident. However, the PSIR stated that the victim "told [his mother] that *afterwards* [defendant] warned [the victim] not to tell anybody about what had happened or that [defendant] would hurt [the victim] or his family." (Emphasis added.) Because the victim's trial testimony did not state when defendant threatened the victim, and because the PSIR indicated that the threat occurred after the abuse, there was not a preponderance of the evidence to support the trial court's factual determination that the threat occurred during the sentencing offense. While it is baffling that defendant's threat to kill the nine-year-old victim that occurred moments after defendant was no longer forcing the victim to touch defendant's penis cannot support an assessment of 50 points for OV 7, MCL 777.37(1)(a) and the accompanying caselaw are clear that the conduct must occur during the commission of the sentencing offense. Therefore, the trial court's assessment of 50 points for OV 7 was clearly erroneous.

## B. OV 10

The trial court did not err in its scoring of OV 10. The trial court may assess 10 points for OV 10 if the defendant exploited a victim's youth. MCL 777.40(1)(b). In criminal sexual conduct cases involving child victims, the trial court is permitted to consider the victim's youthfulness when scoring OV 10. *McFarlane*, 325 Mich App at 536. However, the mere fact that a victim was youthful "does not automatically render the victim vulnerable." *People v Cannon*, 481 Mich 152, 159; 749 NW2d 257 (2008). Vulnerability requires that the victim was susceptible to "injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c). Moreover, it must be shown that the victim was manipulated for selfish or unethical purposes. MCL 777.40(3)(b). In other words, "to merit a score of 10 points for OV 10, a defendant must have manipulated a young victim for a selfish or unethical purpose and the victim's vulnerability must have been readily apparent." *People v Needham*, 299 Mich App 251, 255; 829 NW2d 329 (2013).

In this case, the victim was only nine years old at the time of the sexual abuse. The victim testified that he looked up to defendant as a kind of hero and trusted him. On the basis of this evidence, it was readily apparent that defendant was susceptible to persuasion by defendant because of his youthfulness and trust in defendant as a role model. See MCL 777.40(3)(c); *Needham*, 299 Mich App at 255. When defendant forced the victim to touch his penis, defendant took advantage of and manipulated the young victim for a selfish and unethical purpose. See MCL 777.40(3)(b); *Needham*, 299 Mich App at 255. Because there was sufficient evidence in the record to support a 10-point assessment for OV 10, the trial court did not plainly err in its scoring of OV 10.

In conclusion, OV 10 was properly scored at 10 points, but OV 7 should have been assessed zero points rather than 50 points. This scoring change reduces defendant's total OV score from 70 points, which correlates to OV Level V, to 20 points, which correlates to OV Level II. See MCL 777.64. Defendant's zero-point PRV score remains the same at PRV Level A. See *id*. Therefore, defendant's minimum sentencing guidelines range decreases from 19 to 38 months' imprisonment to 0 to 17 months' imprisonment. See *id*. "[B]ecause defendant's sentence here is based upon an inaccurate calculation of the guidelines range," we affirm defendant's conviction, vacate his sentence, and remand for resentencing. See *Francisco*, 474 Mich at 92.

Remanded for resentencing under the appropriate minimum sentencing guidelines range. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Patrick M. Meter
/s/ Michael F. Gadola