*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
September 15, 2022

v

No. 351622
Macomb Circuit Court
LC No. 2019-000632-FC

REINALDO RICHARD JAMISON,

        Defendant-Appellant.

Before: CAVANAGH, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317, carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and possession of less than 25 grams of cocaine, MCL 333.7403(2)(a)(*v*). Defendant was sentenced to 276 to 600 months' imprisonment for second-degree murder, 24 months' imprisonment for felony-firearm, and 12 to 48 months' imprisonment for possession of cocaine. Defendant raises several claims of ineffective assistance of counsel on appeal. Although we find most of his arguments unavailing, we agree that defense counsel was ineffective when he failed to properly investigate or pursue a self-defense claim and that this deficient performance is sufficient to undermine confidence in the outcome of defendant's trial. We therefore vacate his convictions and sentences and remand for a new trial.

## I. BACKGROUND

This case arises from the death of Andre Fort on August 28, 2018. Fort's exgirlfriend, Crystal Banks, drove Fort to defendant's home so Fort could confront defendant or his brother, Mario Jackson, about a recent incident that was not disclosed at trial.[1] Crystal remained in the car with her children. Crystal testified that she heard what sounded like breaking glass and the sounds of a dispute inside defendant's trailer, but Fort returned to the vehicle and assured her everything

---

[1] According to police reports, it appears that Fort's vehicle was stolen two days earlier by a person associated with Mario.

was fine. Crystal left to go to a party store. When she returned approximately 20 minutes later, she found Fort dead inside the trailer.

Defendant's neighbor, Sue Ann Willson, woke up from a nap that afternoon to the sound of arguing coming from defendant's home. While Willson sat outside with her dog, she observed defendant walk quickly to his vehicle, do something inside the car, then go back toward his trailer. Willson heard a loud thump, like something hit the side of her trailer facing defendant's home, but did not see anything upon inspection of that area. Shortly thereafter, defendant ran to his car and took off "like a bat out of hell," hitting a garbage can in the process.

First responders had to apply pressure to the front door to enter the trailer, as the location of Fort's body behind the front door made it somewhat difficult to open the door. The glass in the lower portion of the window next to the front door was broken, with most of the glass shards on the front steps. The police also discovered cocaine and drug paraphernalia in what appeared to be defendant's bedroom.

Sergeant Goral Rousseau, testifying as an expert in firearms and tool mark identification, determined that the seven cartridge cases recovered from the scene were all .40 caliber, though they were made by four different manufacturers. He was also able to classify two fired bullets as being consistent with .40 caliber ammunition. All the fired cartridge cases were shot from one gun, and the fired bullets that had enough information for analysis were fired from one gun, but Sergeant Rousseau could not say if all the fired components were shot from the same gun.

Dr. Daniel Spitz testified that Fort was shot six times: twice in the head; once in the arm, with the same shot also entering Fort's chest; once in his left wrist; once in the back, with a superficial trajectory traveling across Fort's back; and once in the chest. With the exception of the direct chest wound, all of the shots hit the left side of Fort's body. The trajectory of the chest wound differed in that it had a sharply upward angle and went from front to back without deviation, rather than across the body as the other shots had done. Dr. Spitz opined that the angle was consistent with having been shot while lying on the ground by a person standing some distance beyond Fort's feet. Fort also had a number of nongunshot wounds, including a superficial cut on the inner surface of his left wrist.

Cell phone evidence suggested that defendant was at home at the time of the shooting and went to Pelkey Street, where his cousins lived, afterward. A DNA expert analyzed a blood-stained t-shirt recovered from that area and found very strong support to conclude that it had been worn by defendant. There was also very strong support that the blood and additional contact DNA on the t-shirt came from Fort.

In closing arguments, defense counsel emphasized the lack of eyewitnesses or evidence about how the shooting actually occurred. He also noted the prosecution's failure to produce the gun used in the shooting and opined that there remained a question about "what occurred and who brought the weapon to the scene." Defense counsel argued that common sense suggested Fort came to defendant's home with a gun to confront him about "whatever beef" they had. Counsel belabored the fact that Crystal lied when she denied using the term "confront," reasoning that she wanted to hide the truth—namely, that Fort came to defendant's home with a gun. He further argued that Fort's intent to break in to defendant's home could be inferred from the fact that he

told Crystal to park in an area where she could not see the front door, was carrying gloves in his pocket, and told Crystal to leave for a while. Counsel asked the jury to infer that Fort entered the house by breaking the window with his gun, thereby causing the loud noise heard by Willson and the minor wounds on his wrist described by Dr. Spitz. Defense counsel argued that the evidence suggested "Fort broke into that location, armed with a weapon, was disarmed from [sic] it, and was shot," and that Crystal took the gun from the scene before calling the police. He questioned the failure to test more evidence for DNA, especially the fired cartridge casings, which might have revealed Fort's DNA on the casings and clarify who the gun belonged to. Defense counsel further argued that there was no evidence about how many people were in the home at the time of the shooting, that defendant left before the shots were fired, and that the shooter might have left through the backyard, which could not be seen by Willson. As noted earlier, the jury found defendant guilty of second-degree murder, felony-firearm, and possession of cocaine.

At a postconviction evidentiary hearing regarding defendant's motion for a new trial, defendant testified that he shot Fort in self-defense. Defendant indicated that he was aware of threatening text messages Fort sent to Mario the day before and felt implicated in the threats. A few hours before the shooting, Fort called defendant and made additional death threats toward defendant and Mario, claiming that he was "coming today." According to defendant, Fort broke into defendant's home that afternoon and confronted him with a gun. Defendant tackled Fort, acquired the gun, and shot as Fort was rushing toward him. Defendant then fled from the scene, fearful of being trapped inside by Fort's associates. Defendant recognized that his actions would be viewed with suspicion and therefore hired defense counsel before surrendering to the police on August 30, 2018.

Defendant maintained that he told defense counsel what happened at their first meeting and never denied being the shooter. Defendant explained that he did not agree with defense counsel's plan to make the prosecution first prove that he was the shooter, but agreed to follow counsel's advice. In support of his motion for a new trial, defendant also produced the text messages between Mario and Fort; affidavits from Shaleah Allen, Craig Patterson, and Mario about their knowledge regarding the case and interactions with defense counsel; and recorded jail calls between himself and defense counsel.

Defense counsel refuted defendant's claims about their pretrial strategizing, testifying that defendant consistently denied being the shooter and asserted that someone else must have shot Fort after defendant left. Defense counsel therefore pursued a defense at trial consistent with these assertions. Defense counsel indicated that it was not until midway through the trial that defendant first suggested a self-defense claim, by which time defense counsel did not believe it would be effective to alter their defense.

The trial court concluded that defendant failed to establish a meritorious claim of ineffective assistance and denied defendant's motion for a new trial.

## II. STANDARD OF REVIEW AND CONTROLLING LAW

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Clear error occurs when "the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014) (quotation marks and citation omitted).

"In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. An attorney will not be deemed ineffective for "failing to advance a meritless or frivolous argument," *People v Leffew*, 508 Mich 625, 638; 975 NW2d 896 (2022), nor will this Court second-guess matters of trial strategy on appeal, *People v Ogilvie*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 354355); slip op at 3. The defendant bears a heavy burden to overcome the presumption that counsel acted pursuant to a sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). With respect to the second prong of the test, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citation omitted). The defendant bears the burden of proof with respect to both requirements and must establish a factual predicate for his or her claim. *Id.*

## III. FAILURE TO REQUEST SELF-DEFENSE INSTRUCTION AT TRIAL

Defendant first argues that the trial record supports a self-defense instruction even without additional evidence and that defense counsel was ineffective for failing to request the instruction. We disagree.

A defendant facing criminal charges is entitled to have his or her case determined by a properly instructed jury. *Ogilvie*, ___ Mich App at ___; slip op at 3. Jury instructions "must not exclude material issues, defenses, and theories if the evidence supports them." *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020) (quotation marks and citation omitted). However, "an affirmative-defense instruction is not automatic upon request." *Leffew*, 508 Mich at 644. Rather, the defendant must produce "some evidence from which the jury can conclude that the essential elements of [the defense] are present." *Id.* (quotation marks and citation omitted; alteration in original). In pertinent part, MCL 780.972 provides:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Apart from limiting the duty to retreat, MCL 780.972 did not modify or abrogate common-law self-defense. *Leffew*, 508 Mich at 641. Thus, as has always been true, a viable self-defense claim in a homicide case necessarily requires a finding that the defendant's fatal act was intentional, "but that the circumstances justified his actions." *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (quotation marks and citation omitted).

The defendant's burden of production with respect to a self-defense instruction is not a taxing one—there need only be "some evidence" establishing a prima facie case of the affirmative defense. *Leffew*, 508 Mich at 644. "Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense." *Id*. (quotation marks and citation omitted). Even so, we disagree that the trial record would have supported a self-defense instruction if requested.

Much of the evidence defendant cites in support of this argument involves the prosecution's inability to disprove certain facts that might be consistent with a self-defense theory. For instance, relying on evidence regarding the broken window, Crystal's testimony that she heard breaking glass, Officer Robert Horlocker's agreement that the window could have been broken by the butt of a gun, and the discovery of gloves in Fort's pocket, defendant suggests that Fort broke into the house to confront him.[2] Defendant also emphasizes that the cartridge casings found inside his home were made by four different manufacturers, and Sergeant Rousseau could not exclude the possibility that two guns were used. While these facts could, in theory, be consistent with a claim of self-defense, defendant's reasoning misapprehends the respective burdens of production and persuasion in self-defense claims. It is only *after* the defendant has demonstrated a prima facie case of self-defense that the prosecution must disprove the theory beyond a reasonable doubt. See *Dupree*, 486 Mich at 712. Until defendant met that burden, the prosecution had no obligation to disprove theories inconsistent with guilt. See *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004) ("[T]he prosecution need not negate every reasonable theory consistent with the defendant's innocence, but need merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide.") (quotation marks and citation omitted).

Other evidence cited by defendant simply has no bearing on the self-defense issue in the context of the proofs presented at trial. Defendant directs this Court's attention to the fact that he was seen leaving the scene, that the t-shirt had DNA from both defendant and Fort in areas where there was no blood, and that cell phone evidence suggested he was at home when the shooting occurred and in the area where the t-shirt was discovered after the shooting. This evidence only supports the conclusion that defendant had some interaction with Fort before his death—it does not imply that defendant acted in reasonable self-defense.

The most significant evidence cited by defendant is testimony that defendant and Fort argued before the shooting. Although Crystal insisted that Fort went to defendant's home only to talk, the officer in charge confirmed that Crystal originally said Fort intended to "confront"

---

[2] Defendant also contends that Crystal's 13-year-old son said Fort broke the window, but defendant relies on a police report for this assertion. That fact was not admitted trial.

defendant and Mario. Minor discrepancies in terminology are often inconsequential, but the difference is more significant here. "Confront" undoubtedly has a more hostile connotation than mere "talking." Crystal heard yelling and what she thought was a person hitting the wall with his hand. Willson likewise recalled the sound of at least two people arguing inside defendant's home. But the most that can be said of this evidence is that there was apparently a dispute between Fort and defendant before Fort's death. Crystal agreed that she had seen Fort with a handgun in the past, but she also testified that he did not have a gun with him the day of the shooting. No one else indicated that Fort came to the confrontation armed, and no firearms were recovered during the investigation. Defendant has not identified any evidence demonstrating that Fort's conduct during the confrontation gave defendant an honest and reasonable belief that he had to resort to deadly force to prevent imminent death or great bodily injury.

In the absence of evidence from which the jury could find defendant acted in self-defense, defendant was not entitled to a jury instruction regarding that defense. See *Leffew*, 508 Mich at 644. Because a self-defense instruction was not warranted on this trial record, we cannot find defense counsel performed deficiently by failing to advance a meritless request. See *id*. at 638. We note, however, that defendant's argument on appeal presents an interesting twist, namely, his assertion that defense counsel's closing argument essentially recognized that the case involved self-defense, thereby undermining his decision against requesting a self-defense instruction.

We agree that, despite defense counsel's protestations otherwise at the evidentiary hearing, significant portions of his closing argument implicated a self-defense theory. Without repeating the entirety of the closing argument, some of the most glaring examples of defense counsel's implicit self-defense arguments include the following:

> We know, based on our common sense, that Andre Fort came there with a gun and that's what this case is all about. Is Andre Fort coming to that location to do what, what is that word we heard over and over again, [Crystal] wouldn't tell us on the stand, to confront. . . . And we know what the word confront means. That's to come and beef with somebody. Let's use our common sense. Let's not run away from the truth of this. Andre Fort came over there to confront Mr. Jamison in the household there for whatever beef Andre Fort had going with him.

> \* \* \*

> . . . [Defendant's home was] [b]roken into on the outside by Andre Fort coming in to confront at that location. So went into, broke into, as I believe the evidence shows, someone's home. We always think of our home as our castle, our place of our last resort of protection. And when you have somebody breaking in somebody else's house, things can happen in a negative degree. . . . Did Andre Fort come in that location with the intent to possibly kill or harm someone, but a struggle happened and he was disarmed of the firearm by someone else and that's when this shooting occurred? We don't know because we weren't there, but I suggest to you that what I just argued to you makes as much sense. . . .

> . . . [W]hat I say happened here inside the Jamison home is that Mr. Fort was in there to confront him, charging at someone in there, after they had disarmed

Mr. Fort of the gun and he's coming at them, like this. At that time, he shot through the wrist into the chest and he shot another time in the chest, and then, after he shot when he's turning, he shot in the head, and then, as he's falling, in the head, again, as he's falling back through the back.

* * *

. . . I think everything [the prosecution] argued to you has another side to it in terms of what occurred here, don't lose sight of the fact of who came to that location to confront[,] Andre Fort, don't lose sight of the fact of who's been seen before with a firearm, Andre Fort. Don't lose sight of the fact that it was that Jamison household that he came to, confront and broke in to confront people at that location.

Although defense counsel also argued that defendant left before the shooting occurred and that some unknown third party shot Fort, it is not difficult to imagine that the jury might have believed that the mysterious unknown person was a strawman for defendant. But it does not necessarily follow that defense counsel's failure to request a self-defense instruction was objectively unreasonable. Even if he planted the seed of self-defense in the jurors' minds—whether inadvertently or otherwise—defense counsel correctly opined that the trial record did not support a self-defense instruction. Again, he cannot be faulted for failing to advance a futile position. See *id*. Moreover, even if we determined that defense counsel's decision was objectively unreasonable in light of his closing argument, defendant cannot establish that he was prejudiced by defense counsel's performance because the unsupported instruction should not have been provided, even if requested.

## IV. FAILURE TO INVESTIGATE OR PURSUE SELF-DEFENSE CLAIM

Next, defendant argues that he was denied the effective assistance of counsel when his attorney failed to properly investigate or pursue a self-defense claim. We agree and conclude that defendant has established entitlement to a new trial.

In *Trakhtenberg*, 493 Mich at 52, our Supreme Court explained that despite the presumption that defense counsel acted pursuant to sound trial strategy, "a court cannot insulate the review of counsel's performance by calling it trial strategy." "Initially, a court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is 'reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id*., quoting *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Counsel always retains the 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Trakhtenberg*, 493 Mich at 52, quoting *Strickland*, 466 US at 690-691.

As noted by the trial court, defendant's testimony and evidence regarding defense counsel's representation irreconcilably conflicted with defense counsel's testimony regarding the same. The trial court resolved this conflict in defense counsel's favor, determining that defense counsel was more credible. In evaluating ineffective assistance claims, we defer "to the trial court's superior position to evaluate the credibility of witnesses who testified before it." *People v White*, 331 Mich

App 144, 150; 951 NW2d 106 (2020). This is so because credibility assessments involve more than an evaluation of the witness's words—factors like "tonal quality, volume, speech patterns, and demeanor" play a key role in determining credibility. *People v Lemmon*, 456 Mich 625, 646; 576 NW2d 129 (1998). Yet a trial court's factual findings cannot escape review merely because they are characterized as issues of credibility when the findings are directly contradicted by record evidence. *People v Haynes*, 221 Mich App 551, 563; 562 NW2d 241 (1997). Having reviewed the full record, we are left with a definite and firm conviction that the trial court erred by finding defense counsel's testimony about the events leading up to trial more credible than defendant's version of those events.

Defense counsel testified that he selected the defense theory on the basis of his conversations with defendant. According to defense counsel, defendant was adamant from the beginning of the case that he was not the shooter and never mentioned self-defense until midway through the trial. Defendant, in contrast, maintained that he told defense counsel about his self-defense claim when he first retained defense counsel within days of the shooting and, on more than one occasion, reminded defense counsel that Fort threatened him and broke into his house with a gun. Defendant unequivocally denied telling defense counsel he was not the shooter.

Notably, it does not appear that the trial court's opinion regarding defense counsel's and defendant's respective credibility was influenced by the subtle indicators of truthfulness identified in *Lemmon*, 456 Mich at 646. Rather, the trial court noted two points in support of its credibility finding: that the recorded phone calls did not demonstrate defendant and defense counsel ever spoke about defendant being the shooter, and the trial evidence contradicted defendant's testimony about the shooting. Contrary to the trial court's view of the recorded phone calls, two of the pretrial conversations provide strong evidence that defendant communicated his claim of self-defense to defense counsel early in their professional relationship.

During an early discussion regarding defense counsel's plan for the case, defense counsel explained that he intended to force the prosecution to prove everything at the preliminary examination, then added, "[P]lus we have the background to, you know, self-defense claim, if it gets to that." Considering defense counsel's opinion that the evidence did not support such a claim, it is difficult to imagine why he would believe self-defense was a viable fallback option if defendant had not discussed that theory with him.

With that context in mind, a conversation that took place approximately one month before trial becomes even more telling. Defendant indicated that the way defense counsel wanted to handle the case was not working, that "they don't even know what happened," and "they charging me with second degree and that ain't even really what it is." Defendant opined that making the prosecution prove he "did it" had backfired and "that wasn't even my position." Defendant also rejected defense counsel's comparison of defendant with clients who incriminated themselves when attempting to come up with "clever statements," reasoning that he was not trying to be "clever" and was, instead, "trying to tell them the truth." Defendant said he told defense counsel what happened when they first met, and defense counsel vaguely responded: "[A]ll right. I agree. We need to—we need to figure out what we're doing here in terms of the next moves that are made."

It is clear from this conversation that defendant told defense counsel *something* about the shooting, and that whatever defendant said was inconsistent with defense counsel's strategy of arguing that defendant was not the shooter. While defendant did not expressly state in the calls that he shared his self-defense claim with defense counsel, that conclusion is well supported by defendant's testimony. More importantly, defendant's obvious disagreement with defense counsel's theory of the case is entirely at odds with defense counsel's assertion that he chose to argue defendant was not the shooter on the basis of defendant's own explanation of what occurred. If defendant continuously denied being the shooter, his insistence that the police and prosecution needed to hear "the truth," and that defense counsel's plan "wasn't even my position," are nonsensical.

The significance of the phone calls is also bolstered by the circumstances of their discovery—defendant's appellate counsel asked for the recorded jail calls only *after* defendant and defense counsel testified at the evidentiary hearing and at a time when neither defendant's appellate counsel nor the prosecution knew if recordings of attorney-client phone calls existed. That the calls were made available after this testimony demonstrates that neither witness could have crafted their testimony to account for the recorded conversations, thereby lending further credibility to defendant's story and casting doubt upon the veracity of defense counsel's conflicting recollection.

As noted earlier, the trial court also found defense counsel's testimony more credible because the evidence at trial conflicted with certain portions of defendant's testimony about what occurred on the day of the shooting. Specifically, the trial court cited testimony that the position of Fort's body made ingress through the front door difficult, testimony that the location of most of the broken glass suggested the window had been broken from the inside, and Dr. Spitz's opinions about the nature and location of the gunshot wounds. These issues, however, speak to the credibility of defendant's self-defense claim—not whether defense counsel's investigation of a self-defense claim was reasonable.

The trial court also commented, without significant discussion, on the discrepancy between defense counsel's testimony and the witness affidavits presented at the evidentiary hearing. The court said:

> Similarly, [defense counsel] testified that he spoke with Allen, Patterson, and [Mario] because defendant's mother told him they may have information that would be helpful to the defense. But Allen provided an affidavit stating that she was never called or interviewed, Patterson presented information in his affidavit that he told [defense counsel] various things and yet [defense counsel] never interviewed him, and [Mario] presented an affidavit that that he was willing to testify.

Apart from identifying further discrepancies between defense counsel's testimony and the evidence offered by defendant, the purpose of this observation is unclear. Notably, defense counsel said that he recalled talking to Allen, but could not remember if she told him about the phone call she overheard in which Fort threatened defendant's life—he was unable to deny her assertion with any certainty. Defense counsel was likewise unable to recall if Patterson recounted a phone call during which Fort purportedly said he was going to break into defendant's trailer. The only statement defense counsel specifically disputed was Mario's affidavit, in which Mario

-9-

discussed Fort's text messages and threats. According to defense counsel, Mario did not tell him about the text messages, and Mario was reluctant to testify for fear of being implicated as an accessory after the fact.

Defense counsel testified that he did not remember seeing the text messages presented at the evidentiary hearing before and questioned how appellate counsel knew who was involved in the conversation. But even accepting defense counsel's denial that Mario shared the messages with him, it is clear from the record that defense counsel should have been aware of the text messages. Defense counsel testified that he always obtained discovery at the beginning of a case. A police report summarizing the investigation included a description of the text messages. Although the police report posits that the messages were between defendant and Fort, rather than Mario and Fort, the report's summary of the messages was sufficient to at least bring the exchange to defense counsel's attention. Considering defense counsel's assertion that his first steps in any case include seeking discovery, it appears that he would have had this report by the time he commented on the possibility of a self-defense claim in the first recorded phone call. Under those circumstances, the threats made by Fort in the text messages would have warranted further investigation, regardless of the person to whom the threats were purportedly directed.

We are convinced that the trial court clearly erred by accepting defense counsel's assertion that he chose to forego a self-defense argument because of his conversations with defendant and others. Instead, the record clearly conveys that defense counsel decided not to investigate a potential self-defense claim because he had already decided that the best defense was to deny that defendant was the shooter. While selecting the strongest defense is generally a question of trial strategy, strategic choices made after an incomplete investigation are reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). Because defense counsel did not even consider investigating the theory urged by defendant and supported, at least in part, by independent evidence, he failed to exercise reasonable professional judgment and his representation fell below an objective standard of reasonableness. See *id*. at 52-53.

In order to be entitled to a new trial, defendant must also demonstrate that "but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id*. at 51. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Carbin*, 463 Mich at 600 (quotation marks and citation omitted). The trial court determined that defendant could not meet this burden because it was unlikely "the introduction of additional evidence, such as the text messages and phone calls from Fort or the testimony of defendant, Allen, Patterson, or [Mario], would have resulted in a different outcome when reconciled with the evidence actually presented at trial." We disagree.

There was substantial evidence that defendant was the shooter. Crystal took Fort to defendant's home so Fort could talk to or "confront" defendant. Crystal and Willson both heard arguing, and defendant was the only person seen leaving the trailer after Fort was shot. Fort's blood was found on a t-shirt recovered from the area where defendant fled to, and there was strong DNA evidence supporting the conclusion that defendant had worn the shirt. The most logical inference from this evidence is that defendant was the shooter, but there was no evidence regarding the impetus for the shooting. Had the jury been aware that Fort purportedly threatened defendant, Mario, or both, it might have taken a different view of the circumstances surrounding the shooting.

-10-

We acknowledge that the trial court cited certain instances in which the evidence conflicted with defendant's testimony about the shooting, but those conflicts do not render defendant's account of the shooting entirely implausible. For instance, defendant did not recall having to avoid Fort's body when he reentered the trailer to retrieve his keys, while a first responder indicated that the location of Fort's body behind the door made it difficult to enter the home through the front door. But there was also evidence that Crystal and her son were able to "squeeze" through the door and that Crystal tried to lift Fort before calling the police, potentially moving his body. The trial court also noted Officer Horlocker's testimony that the majority of the broken glass was outside the home, suggesting that it was broken from the inside, which was contrary to defendant's testimony that Fort broke the window from the outside. Yet Officer Horlocker also confirmed that that some glass fell inside the home, and the window was equipped with blinds that could have interfered with the way the broken glass fell. The final conflict identified by the trial court was Dr. Spitz's testimony about the possible sequence of the shots and the fact that the angle of the chest wound was indicative of Fort lying on the ground when he was shot. But Dr. Spitz acknowledged that a person could sustain a series of gunshots to his or her left side if the person charged at the shooter with the left side exposed, even if he did not personally think that was likely in this case.

The test for ineffective assistance of counsel does not demand that defendant prove an unassailable alternative defense. Rather, the defendant need only establish a reasonable probability of a different outcome but for defense counsel's deficient performance. *Trakhtenberg*, 493 Mich at 51. If defense counsel had pursued a self-defense theory at trial—presenting evidence of Fort's threats and defendant's testimony about the circumstances of the fatal shooting[3]—the burden would have shifted to the prosecution to prove beyond a reasonable doubt that defendant did *not* act in self-defense. *Dupree*, 486 Mich at 712. Because we cannot say with confidence that the prosecution would have been able to make that showing beyond a reasonable doubt, defendant has established a reasonable probability of a different outcome. See *Carbin*, 463 Mich at 600 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (quotation marks and citation omitted).

## V. FAILURE TO REQUEST SEVERANCE OF UNRELATED CHARGES

Defendant also argues defense counsel was ineffective for failing to seek severance of the possession-of-cocaine charge. Assuming, without deciding, that defense counsel's decisions regarding this issue fell below an objective standard of reasonableness, defendant has not established a reasonable probability of a different outcome but for counsel's performance.

---

[3] The prosecution suggests that some of the evidence presented at the evidentiary hearing would have been inadmissible on hearsay grounds. We disagree. At minimum, the text messages and Allen's testimony about the conversation she overhead would have been admissible as nonhearsay to establish how Fort's threats affected defendant's perceptions of his later interaction with Fort. See *People v Gaines*, 306 Mich App 289, 306-307; 856 NW2d 222 (2014) ("An out-of-court statement introduced to show its effect on a listener, as opposed to proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c).").

"On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)." MCR 6.120(C). Offenses are related for purposes of MCR 6.120 if they are based on "(a) the same conduct or transaction, or (b) a series of connected acts, or (c) a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1)(a) through (c). Use of the term "must" in MCR 6.120(C) signifies a mandatory directive to sever unrelated offenses upon the defendant's motion. See *People v Fosnaugh*, 248 Mich App 444, 449; 639 NW2d 587 (2001) (agreeing that 'must' is a mandatory term).

Defendant was charged with three offenses in this case: second-degree murder, felony-firearm, and possession of less than 25 grams of cocaine. The first two charges stemmed from Fort's death, while the possession charge arose from evidence discovered in defendant's home during the investigation of Fort's death. We agree that there was no evidence in this case that defendant came into possession of the cocaine during the same conduct or transaction that resulted in Fort's death, that the murder and possession were somehow connected acts, or that they were part of a single scheme or plan. The distinct offenses were, in fact, so *unrelated* that the prosecution almost forgot to address the drug charge in its closing argument.[4]

The prosecution argues on appeal that the murder and possession charges were related because the latter could not have been proved without the investigation and evidence from the homicide. More specifically, the prosecution contends that the circumstances of the homicide investigation—namely, that the then-deceased Fort was the only person in the house when the police arrived, that the cocaine was discovered in defendant's room, and the absence of active cocaine in Fort's system at the time of his death—were necessary to establish constructive possession by defendant. We disagree.

The prosecution's position seems to rest on a statement from *People v Williams*, 483 Mich 226; 769 NW2d 605 (2009), in which the Court favorably cited federal precedent reasoning that "[w]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *Id*. at 237 (quotation marks and citation omitted; alteration in original). But the context in which this statement was made is critical to this issue. The *Williams* Court said:

> Our interpretation of MCR 6.120 is reinforced by the analysis of the United States Court of Appeals for the Sixth Circuit in several cases addressing the analogous federal rules. In *United States v Saadey*, 393 F3d 669 (CA 6, 2005), the court held that joinder of counts for filing false tax returns with counts for filing false credit applications against the defendant was appropriate "[b]ecause the credit application counts contained financial figures that were materially different from those reported on his tax returns . . . ." *Id*. at 678. The court concluded that the multiple counts revealed "a common scheme to defraud." *Id*. A second case involved a defendant charged with conspiracy to commit violent acts against the United States and its officers, in which the court had joined the defendant's drug-

---

[4] After summarizing the pertinent evidence and inferences supporting a second-degree murder conviction, the prosecutor started to shift his focus to the elements of second-degree murder before suddenly realizing that he had yet to "talk at all about the drugs." The prosecution then described the evidence concerning the cocaine and money found in defendant's bedroom.

related and firearms-related counts. *United States v Graham*, 275 F3d 490 (CA 6, 2001). The district court ruled that, based on the grand jury's indictment, the conspiracy to manufacture marijuana was part of "a common scheme or plan" to sell drugs to finance violence. On appeal, the court agreed that joinder of the counts was proper, reaffirming the well-established principle that " '[w]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate.' " *Id*., quoting *United States v Wirsing*, 719 F2d 859, 863 (CA 6, 1983). Similarly, in *United States v Jacobs*, 244 F3d 503, 507 (CA 6, 2001), the court held that the district court had not abused its discretion by denying the motion to sever charges arising from two separate incidents in which the defendant abducted his estranged wife. The court distinguished the defendant's appeal from another case "[b]ecause, as the district court properly concluded, both abductions were part of a common scheme, the counts in the indictment are factually intertwined . . . ." *Id*. The court concluded, "Here, even if the charges were tried separately, evidence from each crime would have been admissible in the trial of the other because of the common scheme or plan." *Id*. The admissibility of evidence in other trials is an important consideration because "[j]oinder of . . . other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial." *United States v Harris*, 635 F2d 526, 527 (CA 6, 1980). [*Id*. at 235-237 (alterations in original).]

Importantly, in each of the three cases reviewed by the Court, the discrete events that established separate offenses were all considered part of a common plan or scheme—a characteristic that renders the offenses related under the plain language of MCR 6.120(B)(1)(c). Consequently, the propriety of the joinder was not merely a matter of "logical" relation or "overlapping proof."

Furthermore, the prosecution's argument regarding the necessity of the homicide evidence in prosecuting the drug charge is unpersuasive. While we appreciate that the drug charge rested on a constructive-possession theory, the fact that the cocaine was discovered during the homicide investigation offers little support for or against finding constructive possession. Rather, the facts relevant to that issue were established by way of evidence that the cocaine was discovered in defendant's home, in a room containing a male's clothes and mail addressed to defendant. The prosecution also presented evidence that the other male resident, Mario, had his possessions and medical equipment in a different bedroom and would not have been able to easily access defendant's bedroom.[5] That Fort was killed in the home had no bearing on the issue of constructive possession.

While we agree that severance of the drug charge would have been necessary if defense counsel had made a timely motion, the question remains whether his failure to do so deprived defendant of the effective assistance of counsel. As noted earlier, a defendant seeking a new trial on the basis of ineffective assistance must make two showings: that " (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance,

---

[5] Mario is paraplegic and confined to a wheelchair.

-13-

there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51.

The trial court dismissed this claim of error below with little explanation, noting only that defendant did not explore this issue with defense counsel at the evidentiary hearing and failed to overcome the presumption that counsel acted pursuant to a sound trial strategy. See *Carbin*, 463 Mich at 600. But merely casting a decision as trial strategy does not insulate it from review. *Trakhtenberg*, 493 Mich at 52. Although defendant focused almost entirely on the self-defense issue at the evidentiary hearing, he presented a cohesive argument regarding the severance issue in his briefing before the trial court that warranted at least some consideration.

But even if defense counsel's failure to move for severance of the drug charge fell below an objective standard of reasonableness, defendant cannot establish a reasonable probability of a different outcome but for defense counsel's performance. See *id*. at 51. The evidence regarding defendant's possession of cocaine was limited to testimony about its location in what appeared to be defendant's bedroom, photographs depicting the same, and a laboratory report confirming that the white substance in the bag was cocaine, which was admitted by stipulation without testimony from the scientist who examined the evidence. The prosecution did not argue a prohibited propensity inference to the jury and discussed the evidence regarding the cocaine only in a brief aside during its closing argument. Defendant has not established entitlement to appellate relief on this basis.

## VI. FAILURE TO REQUEST JURY INSTRUCTION REGARDING EVIDENCE OF FLIGHT

Next, defendant argues that defense counsel performed deficiently by failing to request the model jury instruction regarding evidence of flight. We disagree.

The model jury instruction regarding flight, concealment, and escape provides:

(1) There has been some evidence that the defendant [tried to run away / tried to hide / ran away / hid] after [the alleged crime / (he / she) was accused of the crime / the police arrested (him / her) / the police tried to arrest (him / her)].

(2) This evidence does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt.

(3) You must decide whether the evidence is true, and, if true, whether it shows that the defendant had a guilty state of mind. [M Crim JI 4.4.]

Defense counsel testified that he declined to request this instruction because he viewed it as more favorable to the prosecution, in that it acknowledges that flight can be used as evidence of consciousness of guilt and asks the jury to consider whether the defendant had a guilty state of mind. The trial court determined that defense counsel's decision not to request this instruction was a strategic one, consistent with the defense theory presented at trial. The trial court did not clearly err in this regard.

This Court begins evaluation of ineffective assistance claims with a strong presumption that "counsel's performance constituted sound trial strategy." *Carbin*, 463 Mich at 600. Whether to request a particular jury instruction is often a strategic issue, best left to defense counsel's discretion. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Defense counsel offered a credible explanation for his decision, and this Court will not second-guess his strategic choice with the benefit of hindsight. See *Ogilvie*, ___ Mich App at ___; slip op at 3; *Dunigan*, 299 Mich App at 590. Moreover, although defense counsel opted not to request inclusion of M Crim JI 4.4 in the jury instructions, he did address the negative inferences the jury could have deduced from defendant's flight by arguing that defendant may have left the scene in a hurry because he sensed the trajectory of the confrontation between Fort and the shooter and did not want to be around for a shooting. Defendant has not established that defense counsel's performance fell below an objective standard of reasonableness when he chose not to request that the jury be instructed regarding evidence of flight.

VII.  FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT

Lastly, defendant contends that he was denied the effective assistance of counsel when his attorney failed to object to several instances of prosecutorial misconduct. We disagree.

In his final claim of ineffective assistance of counsel, defendant contends that defense counsel failed to object to prosecutorial misconduct in the form of improper burden shifting, vouching, and mischaracterization of the evidentiary burden. Concerning the first of these issues, the trial court found that the prosecution's challenged comments appropriately responded to the defense theories and that defense counsel was not ineffective for failing to raise a meritless objection. We agree with the trial court.

As this Court has recently reiterated,

[g]iven that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. Prosecutors are given latitude with regard to their arguments. They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case. [*People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020) (quotation marks and citations omitted; second alteration in original).]

But despite the flexibility afforded the prosecution, it "may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). Comments on the defendant's failure to present evidence are also improper because they, in effect, attempt to shift the burden of proof to the defendant. *Id*. at 464. On the other hand, "where a defendant . . . advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant." *Caddell*, 332 Mich App at 72 (quotation marks and citation omitted).

-15-

Defendant takes issue with the prosecution's rebuttal comments regarding the absence of evidence that Fort broke into defendant's home through the window. The prosecution argued that that the jury heard "zero evidence" about "breaking in" or "butts of guns breaking windows." The prosecution also noted that defendant had an absolute right not to "say a word," but that if defendant believed an additional photograph of the broken window would have been helpful, he had access to all the photographs. These comments were directly responsive to defense counsel's closing argument, wherein he opined that Fort broke into defendant's home through the window, likely using the butt of his gun to do so, and that the prosecution was hiding something by failing to introduce a photograph of the glass that was located on the floor inside the house. Viewing the prosecution's comments regarding the window in context, it is clear that the prosecution was rebutting the validity of defense counsel's arguments, rather than shifting the burden of proof to defendant.

Defendant also challenges the prosecution's comments about the absence of evidence that Fort entered defendant's home with a gun. In its initial closing argument, the prosecution observed that defense counsel claimed a witness would testify that Fort had a gun at defendant's home, but no such witness was presented. In its rebuttal arguments, the prosecution commented on the same topic again, and similarly noted that "no one saw [Fort] with a gun like you were told you were going to hear." The prosecution was referring to defense counsel's cross-examination of Crystal. Defense counsel asked Crystal if she had ever seen Fort with a gun, prompting the prosecution to object to inadmissible character evidence. In pertinent part, defense counsel responded that there would be "another witness to testify that, in fact, [Fort] came in with a gun." Defense counsel, however, did not elicit that testimony from any of the prosecution's witnesses or call any defense witnesses. The prosecution's comment regarding the absence of that witness or testimony was permissible because there is no prohibition against highlighting a defendant's failure to follow through on such promises. See *People v Fields*, 450 Mich 94, 115-116; 538 NW2d 356 (1995) (agreeing with appellate opinion reasoning that the prosecution may observe that the defense failed to "prove[] what it said it would in its opening statement"). Because the prosecution did not improperly shift the burden of proof to defendant, the trial court correctly concluded that defense counsel was not ineffective for failing to object. See *Leffew*, 508 Mich at 638.

Defendant's next argument concerns the following statement made at the beginning of the prosecution's closing argument:

> Bear with me. I like to talk. I like to sit right up here on a chair and talk to you guys and explain the whole case. *This case has been going on for a year. I'm very familiar with the case, the ins and outs, the evidence, the witnesses, et cetra* [sic]. However, I may go back and forth also. I want to make sure that I don't miss anything and that's so that you don't miss anything. [Emphasis added.]

Defendant contends that the emphasized portion of this quotation constituted prosecutorial vouching and that defense counsel should have objected. The trial court disagreed, reasoning that there was nothing improper about noting the prosecution's familiarity with the case when the prosecution did ask the jury to suspend its judgment in deference to the prosecution's view of the case. The trial court did not err in this regard.

The prohibition on prosecutorial vouching is another limitation imposed on the broad range of tools a prosecutor may employ at trial. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 426; 884 NW2d 297 (2015). This impermissible tactic occurs when the prosecution "vouch[es] for the credibility of a witness to the effect that [the prosecution] has some special knowledge concerning a witness' truthfulness." *Id*. (quotation marks and citation omitted; second alteration in original). Here, the prosecution was merely prefacing its lengthy closing argument by explaining that it might jump from point to point in order to make sure the prosecution's theory was explained in full. The prosecution's comment regarding its familiarity with the case, evidence, and witnesses did not imply special knowledge regarding the credibility of the prosecution's theory. Because this comment did not involve prosecutorial vouching, there was no basis for defense counsel to object, and the trial court correctly determined that defense counsel did not perform deficiently by failing to advance a meritless objection. *Leffew*, 508 Mich at 638.

Defendant's final claim concerning defense counsel's response to prosecutorial misconduct involves an analogy offered by the prosecution during voir dire. While questioning the venire about the concept of reasonable doubt, the prosecution explained that proof beyond a reasonable doubt could exist even without evidence of every surrounding circumstance. The prosecution compared its explanation to an unfinished puzzle depicting red and white stripes with a blue rectangle containing stars in the corner, reasoning that one could determine beyond a reasonable doubt that the image was an American flag, even if a few pieces were missing. Defendant contends that defense counsel should have objected because the prosecution's analogy presented a fundamentally improper definition of reasonable doubt that misled the jury about the applicable burden of proof. The trial court deemed this issue abandoned because defendant failed to establish that the prosecution's analogy amounted to prosecutorial misconduct that should have elicited an objection. We agree with the trial court.

Both before the trial court and on appeal, defendant presents this argument without citation to relevant authority. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). The trial court did not err by determining that defendant's superficial, unsupported argument did not properly present this issue for consideration.

## VIII. CONCLUSION[6]

Defense counsel was ineffective when he failed to properly investigate or pursue a self-defense claim. The trial court clearly erred when it accepted defense counsel's patently incredible testimony on this issue. Moreover, defense counsel's deficient performance in this regard is

---

[6] Defendant also argues that the cumulative effect of multiple errors requires reversal. Defendant did not properly present this issue for review by identifying it in his statement of the questions presented on appeal. See *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003). We need not address this issue at any rate because we agree that defendant is entitled to a new trial for the reasons explained in Part IV of this opinion.

sufficient to undermine confidence in the outcome of defendant's trial.  We therefore vacate his convictions and sentences, and remand for a new trial.  We do not retain jurisdiction.


/s/ Mark J. Cavanagh
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates